IN THE SUPREME COURT OF THE STATE OF DELAWARE

CHRISTOPHER WHEELER,     §
    §     No. 205, 2015
    Defendant Below,     §
    Appellant,     §     Court Below:
    §
    v.     §     Superior Court
    §     of the State of Delaware
STATE OF DELAWARE,     §
    §     Cr. I.D. No. 1310019248
    Plaintiff Below,     §
    Appellee.     §

Submitted: January 20, 2016
Decided: March 2, 2016

Before **STRINE**, Chief Justice; **HOLLAND**, **VALIHURA**, **VAUGHN**, and **SEITZ**, Justices, constituting the Court *en Banc*.

Upon appeal from the Superior Court. **REVERSED AND REMANDED**.

Thomas A. Foley, Esquire, Wilmington, Delaware for Appellant.

Andrew J. Vella, Esquire, Department of Justice, Wilmington, Delaware for Appellee.

**VALIHURA**, Justice:

In this direct appeal, Christopher Wheeler ("Wheeler") seeks to overturn his conviction of Dealing in Child Pornography. He raises two issues. *First*, he challenges a September 18, 2014 decision of the Superior Court denying his Amended and Superseding Motion to Suppress ("Motion to Suppress"). The Motion to Suppress sought to exclude evidence collected from Wheeler's home and office during a search executed pursuant to two warrants related to witness tampering. The challenged warrants covered Wheeler's entire digital universe and essentially had no limitations. In performing the search, officers seized 19 electronic devices and other digital media. Despite the broad, generalized language in the challenged warrants, the State found no evidence of witness tampering on any of Wheeler's devices. But when performing a cursory search of the data on an iMac found in Wheeler's piano room closet (the "iMac"), police discovered files containing child pornography. Wheeler contends that the search warrants were in the nature of "general warrants" and were overly broad in scope, in violation of the Fourth Amendment to the United States Constitution and Article I, § 6 of the Delaware Constitution.[1]

*Second*, Wheeler appeals from a December 22, 2014 decision of the Superior Court denying his Motion to Dismiss and/or for Judgment of Acquittal ("Motion for Judgment of Acquittal"). Wheeler was charged with 25 identical counts of Dealing in Child Pornography based upon 25 images of child sexual exploitation—all of which were found on the iMac. Wheeler argues that there was insufficient evidence to convict him

---

[1] Wheeler is joined by *amicus curiae*, American Civil Liberties Union Foundation of Delaware (the "ACLU"), which filed a brief in support of reversal.

1

because the State could not establish that he was aware of the existence of the offending images in his "newsgroup cache." The State admits it has no proof that Wheeler ever viewed any of the images, which automatically "cached" on his computer, with no human intervention, as a result of his subscription to certain "newsgroups." Wheeler was sentenced to 50 years at Level V.

Throughout these proceedings, Wheeler has asserted that the State utilized charges of witness tampering stemming from his admission in 2013 that he had molested two brothers in Pennsylvania in the 1980's as a pretext to search broadly for child pornography. The challenged warrants in this case are the witness tampering warrants—not the later-obtained child pornography warrant. But the State admits that the challenged witness tampering warrants were virtual copies of an off-the-shelf warrant for child pornography.

Because we agree that the challenged witness tampering warrants were in the nature of "general warrants" in violation of the United States and Delaware Constitutions, we reverse the judgments of the Superior Court and remand this matter for further proceedings in accordance with this Opinion.

## I. FACTS

### A. *Christopher Wheeler*

Christopher Wheeler is the former headmaster at the Tower Hill School ("Tower Hill") in Wilmington, Delaware. He has an adult son, NK,[2] whom he adopted when NK

---

[2] Because the victims in this matter were juveniles at the time they were subject to abuse, we have assigned pseudonyms *sua sponte*.

was twelve or thirteen.[3]  In the 1980's, Wheeler lived with the "W" family in West Chester, Pennsylvania for months at a time.  The Ws took in a number of students that attended the Westtown School, where the three W brothers went to school.[4]  Wheeler was one of these students.  Wheeler was approximately 16 or 17 when he began living with the Ws.  Even after he left Westtown School, Wheeler maintained a relationship with the W family.

Approximately 35 years ago, Wheeler sexually abused two of the W brothers.  In 2005, Wheeler returned to the Delaware area after having spent time in Illinois with his adopted son.  Wheeler became the headmaster of Tower Hill.  In 2008, Wheeler and NK lived with the Ws before moving onto the Tower Hill campus.

**B.**     ***In 2013, the W Brothers Confront Wheeler About the Abuse Wheeler Inflicted on Them in the Early 1980's***

After the Jerry Sandusky scandal broke, one of the W brothers, MW, resolved to tell his two adult brothers, SW and TW, that Wheeler had molested him when he was approximately 11 to 13 years old, at a time when Wheeler was in his early-20's.  Upon hearing this, SW told his brothers that Wheeler had also molested him when he was approximately 13 to 15 years old.  TW told MW and SW that, although Wheeler had never physically or sexually abused him, Wheeler had inappropriate sexual conversations with TW when TW was a boy.

After the W brothers told each other about their past experiences with Wheeler, MW wrote Wheeler a letter.  The letter read, in part: "*I shudder at the notion that you, in*

---

[3] A27 (Affidavit 1 ¶ 6).
[4] A135.

3

*your career, have chosen an environment that brings you into daily contact with other boys who are as old as I was when you molested me.*[5] MW's letter also provided that MW "*wants nothing to do with Chris Wheeler ever and wants him to stay away from him and his family.*"[6] MW supplied Investigator Robert Schreiber ("Investigator Schreiber") of the Delaware Department of Justice with a copy of the letter.

On July 20, 2013, SW also wrote Wheeler. MW provided Investigator Schreiber with a "draft" of SW's letter. Unlike MW's letter, SW's three-page letter invited a response from Wheeler. It read, in part:

> If I had known the torment, pain, humiliation, and anger that your molestation and abuse of me as a child would cause me these 35 years later, I would have had greater strength to stand up to you and defend myself. The fact that you preyed upon me in my own home, from the room next to mine, is lewd and inexcusable. The reality that you continue to shirk any responsibility for the harm that you caused, as if it never occurred, will continue no longer.[7]
>
> \*    \*    \*
>
> I will not keep quiet and hide from your abuses any longer. I have not yet determined how or when to tell my parents of the harm, pain, and humiliation that you have caused. . . . The real and full truth must be told and brought to light; beginning now.
>
> The only thing that I am sorry for is that it has taken me this long to gain the fortitude to bring your past abuses to the surface, to move towards holding you accountable for your predatory and abusive actions. Despite my pain and anger, I am curious to return part of the burden to you; what does justice look like for Chris Wheeler for the molestation you perpetuated, culpability you willingly evade, and the harms that you

---

[5] A27 (Affidavit 1 ¶ 10).
[6] *Id.*
[7] A130.

4

continue to cause?  *What role (if any) should you play in determining appropriate resolution to and restitution for the abuses you have caused?*[8]

On July 23, 2013, Wheeler responded to SW's letter.  In his reply letter, Wheeler admits his wrongdoing.  It reads, in part:

> *I will not compound your pain by attempting to deny or in any way deflect responsibility for my actions 35 years ago.  I did those things.  I am the one responsible.*

> I am profoundly sorry.  Some things are unforgivable, so I don't expect forgiveness from any of you.  Nevertheless, I ask for your forgiveness.

> *       *       *

> The truth is that I have carried inside of me a profound and loud dissonance, an ever-present reminder that some evil has been done and it cannot be undone.  And I am responsible for it.

> *       *       *

> You hoped for proof of my conscience, my contrition, my sense of accountability.  Only you know if you see proof of those things in this letter.  Regarding my compunction to make right the many wrongs that I have committed, perhaps this letter is evidence of at least a few steps in that direction as well.  *I'll wait to hear from you about further appropriate steps towards resolution and restitution.*[9]

MW provided the investigators with a copy of Wheeler's response.  SW told investigators that he still had Wheeler's original response letter and the corresponding FedEx envelope in his possession.

Rather than writing a letter, TW held telephone conversations with Wheeler to arrange a face-to-face meeting at Wheeler's home on July 25, 2013.  TW also exchanged e-mails with Wheeler, who used his Tower Hill e-mail address.  According to TW, at the

---

[8] A130-32 (emphasis added).
[9] A133 (emphasis added).

5

meeting, Wheeler apologized for his previous actions and told TW that he was going to meet with NK to tell him about his abuse of the W brothers. Wheeler also told TW that he had recently contemplated suicide.

**C.** ***The Witness Tampering Warrants Target Wheeler's Entire Digital Universe and are Cut-and-Pasted from Child Pornography Warrants***

On October 22, 2013, the Wilmington Police Department, working in concert with the State of Delaware, sought and obtained two search warrants from the Superior Court. The first search warrant ("Warrant 1") related to Wheeler's residence in Wilmington, Delaware and his 2011 Chevrolet Equinox. The second warrant ("Warrant 2" and jointly with Warrant 1, the "Witness Tampering Warrants") was for Wheeler's office at Tower Hill and for the same vehicle.

The Witness Tampering Warrants were substantially similar and were each supported by a corresponding affidavit of probable cause.[10] The Witness Tampering Warrants and Affidavits together sought to gather evidence related to two witness tampering crimes: (1) Tampering with a Witness under 11 *Del. C.* § 1263(3); and (2) Act of Intimidation of a Witness under 11 *Del. C.* § 3532. The affiants were Detective Cecilia E. Ashe ("Detective Ashe") and Chief Investigator Robert J. Irwin ("Chief Investigator Irwin"). On the date the Witness Tampering Warrants were issued, Detective Ashe was an officer with the Wilmington Police Department. Chief

---

[10] For purposes of this Opinion, Warrant 1's affidavit of probable cause is referred to as "Affidavit 1." Warrant 2's affidavit of probable cause is referred to as "Affidavit 2." Collectively, Affidavit 1 and Affidavit 2 are referred to as the "Affidavits." Similarly, the applications in support of the Witness Tampering Warrants are collectively referred to as the "Applications."

Investigator Irwin was with the Delaware Department of Justice and, at the time, was assigned to the Child Predator Task Force. Investigator Schreiber is also mentioned throughout the Affidavits, as he provided information to Detective Ashe and Chief Investigator Irwin.

The Affidavits are based in large part on interviews with the W brothers, and incorporate the brothers' statements regarding communications they had with Wheeler in July 2013. The police also interviewed MW's wife and the W brothers' parents. As to NK, the sum of the witness tampering allegations contained in the Affidavits is that an officer of the Bluffton Police Department in Bluffton, South Carolina told Investigator Schreiber that, while investigating an incident at NK's South Carolina residence, NK informed him that Wheeler would "penetrate his anus and that [NK] never previously reported this to the authorities because [Wheeler] would pay him off."[11] The Affidavits suggest that this took place in Illinois, but provide no other details regarding Wheeler's alleged tampering with NK.

The Affidavits state that MW spoke with authorities during the week of October 14, 2013. MW told personnel in the Department of Justice that approximately 35 years ago, when he was 12 or 13 years old, Wheeler molested him. At the time, Wheeler was 22 or 23 years old. MW also stated that Wheeler molested SW when SW was a boy.[12]

---

[11] A28 (Affidavit 1 ¶ 20).
[12] A26 (Affidavit 1 ¶ 2). SW told Investigator Schreiber that Wheeler molested him when he was approximately 13 to 15 years old. A28 (Affidavit 1 ¶ 15). SW stated that "the sexual abuse took place multiple times over a period of months, possibly for a year." A28 (Affidavit 1 ¶ 15).

7

MW advised that the sexual abuse took place when Wheeler lived at the W family residence in West Chester, Pennsylvania.

The Affidavits refer to and quote from the italicized portions of the letters in the previous section. The Affidavits also recount that the W brothers decided to confront Wheeler about the abuse he had inflicted upon them. The first communication from the W brothers to Wheeler occurred in July 2013.

According to the Affidavits, in July 2013, MW sent a letter to Wheeler, confronting him about what had happened. TW also confronted Wheeler in a face-to-face meeting in Wilmington, Delaware. On October 22, 2013, TW told Investigator Schreiber, according to the Affidavits, that he and Wheeler "communicated via telephone and e-mail using [Wheeler's] Tower Hill [e]-[m]ail address to coordinate a meeting in Wilmington and then to communicate since."

The Affidavits provide that NK complained about Wheeler to MW's mother when visiting her home in West Chester, Pennsylvania. During a visit, NK "stated that his father had abused him[,]" according to the Affidavits. When MW's mother asked NK what he meant, NK responded: "You know. You know."

According to the Affidavits, on October 22, 2013, Investigator Schreiber contacted Officer Anson Singleton of the Bluffton Police Department. The Affidavits then recite the following: "Officer Singleton stated that while investigating the incident at [NK's] residence, [NK] told him that his dad would penetrate his anus and that he never previously reported this to the authorities because his father would pay him off. When the officer asked [NK] where this occurred, [NK] said it occurred when they lived in

8

Illinois."  The Affidavits did not provide a time frame as to when these events allegedly occurred.

The first three sections of the Affidavits set forth the background of the affiants ("Section A"), "Terms and Definitions" ("Section B"), and "Issues of Staleness Associated with [C]omputer [I]nvestigations" ("Section C").  Sections A and B highlight the extensive background of Chief Investigator Irwin in the area of crimes against children, and generally describe electronic data, electronic filing systems, hard drives, storage media, and Internet and local networks.  The broad, sweeping "staleness" section, comprised of five paragraphs, emphasizes that digital data can often be forensically recovered "years after it [i]s written."[13]

Against the backdrop of this boilerplate language, which underscores technology's capacity to preserve digital data for lengthy periods of time and the ability of forensic experts to recover it, the concluding paragraphs of the Affidavits recite the history and facts underlying the complaint ("Section D").  The concluding paragraphs of Section D refer to documents, e-mails, and "other electronically stored communications," and state that cellular phones may contain evidence, including text messages and e-mails. Although the investigators had copies of the letters referenced above, the Affidavits state that "there may be evidence of written communications at the residence and the personal work place [*sic*] of the subject" and that "[w]ritten communications were sent to the

---

[13] Section C also states that, "[w]ith the advent of larger capacity hard-drives, removable media, and CD/DVD burners over the past several years, the retention and therefore recovery of, data from digital media has greatly increased."  A25.  With respect to DVDs and CDs, Section C observes that "[t]he data stored on them is highly stable and not usually subject to corruption barring physical damage to the media itself."  A25-26.

9

victims . . . ." The affiant averred that "evidence of this correspondence may be envelope [*sic*], letters, address books and handwritten notes."

Later on October 22, 2013, the Wilmington Police Department and the State of Delaware obtained the Witness Tampering Warrants.[14]

Despite mention of written communications in the Affidavits, the Witness Tampering Warrants listed, under "ITEMS TO BE SEARCHED FOR AND SEIZED[,]" the following broad categories of items:

2. Search the following location within the residence described herein the application and affidavit [*sic*] to include but not limited to: locked or unlocked safes, boxes, bags, compartments, storage areas or things in the nature thereof, found in or upon said residence that could be used to contain evidence[.]

3. *Any* personal computer, computer system, device or component to include desktop(s), laptop(s), notebook(s), PDA(s), or tower style systems capable of storing, retrieving, and/or processing magnetic, digital or optical data and in particular any such devices capable of connecting to or communicating with the Internet or Internet Service Providers by any means including dial-up, broadband, or wireless services.

4. *Any* digital or optical data storage device connected to, capable of being connected to, read by, or capable of being read by, any item described in paragraph 4, to include: internal or external hard drives (found within or without any item seized pursuant to paragraph 4), mass storage devices, pen drives, smart cards, compact disks(CD), compact disk – recordable (CD R) or re-writable (CD RW), floppy diskettes, DVD+/- R or RW, or any other such device that stores digital data optically, electronically, or magnetically.

5. *Any* cellular telephone, to include the registry entries, call logs, pictures, video recordings[,] text messages, user names, buddy lists, screen names, telephone numbers, writings or other digital material as it relates to this investigation.

---

[14] The Applications, with respect to the items to be searched for and seized, are substantially similar to the Witness Tampering Warrants. *Compare* A19, *with* A21-22. *Compare* A31, *with* A33-34.

6. *Any* digital camera, digital video camera, optical camera, optical video camera, cell phone, or other device capable of capturing and storing to any media, photographs or images and the associated media there from [*sic*].

7. *Any and all* data, and the forensic examination thereof, *stored by whatever means* on any items seized pursuant to paragraphs 4, 5, and 6, as described above to include but not limited to: registry entries, pictures, images, temporary internet files, internet history files, chat logs, writings, passwords, user names, buddy names, screen names, email, connection logs, or other evidence.

8. *Any* file, writing, log, artifact, paper, document, billing record or other instrument, stored electronically or in printed form, which relates to or references the owner of items seized pursuant to paragraphs [] 2, 3, 4, 5, 6, 7 and 8, as described above.[15]

After reviewing the Affidavits, a Superior Court judge (the "Issuing Judge") determined that there was probable cause for a search and seizure of Wheeler's property. The Witness Tampering Warrants were then issued.

### D. *The Search and Seizure*

During the evening of October 22, 2013, law enforcement officers executed the warrants for Wheeler's home and office at Tower Hill. The team seized several computers and other electronic devices, including: (1) two iMacs; (2) a Mac PowerBook G4; (3) two external hard drives; (4) two iPhones; (5) a Tungsten Palm; (6) an iPad; (7) a MacBook Pro; (8) 26 CDs; and (9) 23 DVDs.

After the Witness Tampering Warrants were executed, Sergeant Kevin Perna of the Delaware State Police Department ("Sergeant Perna")—a forensic examiner who, at the time, had performed nearly 500 forensic examinations and taught classes related to the subject at a local law school and the Delaware police academy—conducted a forensic

---

[15] A19 (Warrant 1 ¶¶ 2-8) (emphasis added); A31 (Warrant 2 ¶¶ 2-8) (emphasis added).

search of the seized devices using EnCase. This was his first forensic examination using EnCase, a software program utilized by law enforcement to forensically examine computers and other electronics. Using this software, a forensic examiner can perform keyword searches, access files that a standard computer search would not uncover, and view "all the contents on [a] hard drive . . . ."[16]

Despite orders from Chief Investigator Irwin that directed Sergeant Perna to search for "text-type" documents, Sergeant Perna's forensic evaluation of Wheeler's data captured "image files" and "video files."[17] Sergeant Perna acknowledged that video and image files were not implicated in the context of this case and were not subsumed within his "more restrictive" marching orders from Chief Investigator Irwin.[18]

Sergeant Perna also acknowledged that the EnCase software enabled him to filter Wheeler's data by limiting the search results to certain file extensions, such as .doc, .text, .pdf, which were among the items he was seeking, and that he could have removed image and movie video files. He testified as follows:

> Q. . . . So had you put those kind of conditions [*sic*] in, it would have restricted the files that would have popped up and you would not have seen video or image files; correct?
>
> A. Yes.[19]

Instead of restricting his search, Sergeant Perna performed a review of the "folder structure" on the iMac, including the "Desktop" folder, which enabled him to review all

---

[16] A185 (Tr. 14:3-6).
[17] *See* A194 (Tr. 47:6-8).
[18] A193 (Tr. 43:10-13); A194 (Tr. 47:16-23).
[19] A194 (Tr. 48:10-14).

12

of Wheeler's digital files. He stated that he prefers to "see all of the files, . . . [so that he can] find the ones that are pertinent and things that are not pertinent."[20] This cursory search of the files on the hard drive of the iMac occurred while Sergeant Perna ran a keyword search using the terms "witness intimidation" and "witness tampering." During this cursory review, he found files that appeared to be video files. Because these files—labeled "GERBYS II" and "hippodrome boys large"—seemed suspicious, Sergeant Perna asked Detective Scott Garland ("Detective Garland") if he was familiar with them. Detective Garland explained that these titles were related to child pornography.

Based upon Sergeant Perna's discovery of these two files, on October 29, 2013, the State obtained an additional search warrant from the Kent County Superior Court to search previously seized devices for child pornography (the "Child Pornography Warrant").[21] The Child Pornography Warrant authorized the search and seizure of digital devices the investigators already had in their custody.[22] The State did not open the video files until it obtained the Child Pornography Warrant.[23] After viewing the files, the State sought and obtained an indictment against Wheeler on charges of Dealing in Child Pornography under 11 *Del. C.* § 1109(4).

### E. *The Indictment*

---

[20] A197 (Tr. 62:19-21).

[21] On October 23, 2013, a separate search warrant was obtained for Wheeler's 2011 Chevrolet Tahoe. On October 25, 2013, the State also obtained a search warrant for Wheeler's airplane.

[22] The application for the Child Pornography Warrant contained a broad "catch-all" provision that was nearly identical to the catch-all provision in the Witness Tampering Warrants, all of which permitted the search, seizure, and forensic examination of "[a]ny and all data" on Wheeler's devices.

[23] Wheeler correctly maintains that, if his challenge to the Witness Tampering Warrants is successful, all evidence seized and recovered thereafter represents "fruit of the poisonous tree."

On December 9, 2013, a Grand Jury returned an indictment against Wheeler. The indictment charged Wheeler with 25 counts of Dealing in Child Pornography in violation of 11 *Del. C.* § 1109(4). In relevant part, the statute provides:

> A person is guilty of dealing in child pornography when: . . . (4) The person, intentionally compiles, enters, accesses, transmits, receives, exchanges, disseminates, stores, makes, prints, reproduces or otherwise possesses any photograph, image, file, data or other visual depiction of a child engaging in a prohibited sexual act or in the simulation of such an act.[24]

Of the 19 devices seized from Wheeler's home and office, three contained images of child pornography. The indictment was based upon 25 images recovered from the newsgroup cache on Wheeler's iMac. The iMac itself had not been turned on since September 29, 2012.[25] Of the 25 images of child pornography, only one was cached after 2009. Specifically, one image was cached on September 2, 2005, one image was cached on January 1, 2010, and the remaining images were cached between July and September 2009.

### F.    *The Motion to Suppress*

On May 5, 2014, Wheeler filed the Motion to Suppress. On May 23, 2014, the Superior Court held a hearing on the Motion to Suppress. The State presented the testimony of Sergeant Perna. Wheeler presented testimony from his expert witness, Tami L. Loehrs ("Loehrs"). Sergeant Perna testified that he was looking for evidence of witness tampering and witness intimidation, particularly in the form of "text-type"

---

[24] 11 *Del. C.* § 1109(4).

[25] A245 (Tr. 49:5-10). As Sergeant Perna testified, the forensic significance of the date of last access merely signified the date on which the computer was last powered on, and it did not reflect that any newsgroup or newsreader was accessed on that date. A245 (Tr. 49:11-17).

documents. On cross-examination, he agreed that the Witness Tampering Warrants' lists of items to be searched for and seized were "almost virtually identical to exactly the list [one] would see in a child pornography case." He also agreed that the Witness Tampering Warrants essentially had no limitations and that the warrants, on their face, were "wide open."

The Superior Court heard final arguments from the parties on the Motion to Suppress on July 11, 2014. The State, again, conceded that the substance of the Witness Tampering Warrants "could be viewed as a cut-and-paste from a [warrant related to] child porn[.]"[26] Further, at oral argument before this Court, the State conceded that the Witness Tampering Warrants did not contain "anything particularized from the evidence that they were . . . searching."[27]

On September 18, 2014, the Superior Court issued its Opinion denying Wheeler's Motion to Suppress.[28] The Superior Court did not explicitly address the issue of whether the Witness Tampering Warrants were general warrants in violation of the Fourth Amendment to the United States Constitution, Article I, § 6 of the Delaware Constitution, and 11 *Del. C.* § 2307(a).

### G. *The Bench Trial*

---

[26] A230 (Tr. 34:16-19) (The Superior Court: "How do you address the issue that this could be viewed as a cut-and-paste from a child porn [warrant]?" Prosecutor: "Well, [Y]our Honor, I don't -- the State concedes that.").

[27] Videotape: Oral Argument before the Delaware Supreme Court, at 43:35 (*Christopher Wheeler v. State of Delaware*, No. 205, 2015, Jan. 20, 2016), *archived at* http://livestream.com/accounts/5969852/events/4710274/videos/109946633/player?autoPlay=false&height=360&mute=false&width=640 [hereinafter, "Oral Argument at __"].

[28] *See generally State v. Wheeler*, 2014 WL 4735126 (Del. Super. Sept. 18, 2014) [hereinafter, "*Wheeler I*, 2014 WL 4735126, at __"].

On October 7, 2014, the Superior Court held a bench trial. The parties stipulated to the facts that Wheeler was the sole user of each of the seized devices and that each of the 25 images at issue constituted child pornography under Delaware law. Wheeler did not take the stand in his defense, and the sole witness at trial was Sergeant Perna. However, since becoming EnCase certified in 2013, Sergeant Perna had never performed a child pornography-related forensic examination before his evaluation of Wheeler's digital universe.[29]

At trial, it was undisputed that the charged images came to be on each of Wheeler's devices through his subscription to newsgroups. Newsgroups are Internet discussion groups in which people exchange, browse, upload, and download files, which can be documents, photos, or videos. It was also undisputed that there is nothing illegal about newsgroups as a general matter, and that they exist on a variety of legitimate topics. Because the 25 indicted images were found in the newsgroup cache, the State agreed throughout the proceedings that this was not an Internet case. Nor was an indictment obtained with respect to Wheeler's Internet activity.

Sergeant Perna testified that the 25 charged images were found in two newsgroups that Wheeler subscribed to: "alt.binaries.pictures.asparagus" and "alt.fan.air."[30] However, Sergeant Perna acknowledged that there is no way to forensically determine whether a newsreader user has viewed any particular file. Accordingly, at oral argument

[29] Sergeant Perna's testimony in this case represented the first time that he had ever testified as an expert in a child pornography trial.

[30] A240 (Tr. 29:8-31:6). Sergeant Perna found four newsgroups related to child pornography that Wheeler subscribed to on the PowerBook: "alt.binaries.pictures.asparagus," "alt.fan.prettyboy," "alt.fan.rdm," and "alt.fan.snuffles." *Id.* at Tr. 31:11-32:6.

before this Court, the State conceded that it could not conclusively prove that Wheeler ever viewed the 25 charged images at issue.[31]

At trial, Sergeant Perna acknowledged that he had no expertise concerning newsgroups or newsreaders.[32]  He explained that information from newsgroups automatically caches on the subscriber's computer, regardless of whether the user accesses that information.  But if Wheeler had downloaded the images of child pornography from the newsgroups, Sergeant Perna agreed that such images should have appeared somewhere other than the cache on Wheeler's computer.  Here, the 25 charged images appeared only in the cache.  Accordingly, Sergeant Perna conceded that the government could not forensically establish that Wheeler ever viewed the 25 indicted images:

> Q.    Fair to say that the 25 charged images here found in the cache, you cannot forensically say whether or not they were ever viewed, correct, you can simply say they cached?
>
> A.    Cached.[33]
>
> \*        \*        \*
>
> Q.    But it is possible that not only was the image never viewed, but the news[]group wasn't even visited on those dates when they cached, correct?
>
> A.    Correct.[34]
>
> \*        \*        \*

---

[31] *See* Oral Argument at 52:20.
[32] *See* A243 (Tr. 43:6-8) (Q.  [Newsreaders are] not something that you had a lot of expertise about, correct?  A.  No, sir.).
[33] A250 (Tr. 71:4-8).
[34] A251 (Tr. 76:12-15).

Q. And you cannot say that Mr. Wheeler actually opened up and viewed the news[]groups on the days in question?

A. No.

Q. And you cannot say that he ever viewed any of the images that he has been charged for, correct?

A. No.[35]

\* \* \*

Q. All you can tell is what news[]group the person has selected a box [*sic*], correct?

A. Yes.

Q. You can never know if they ever even viewed that particular news box, much less the contents within?

A. No.[36]

Based upon such testimony, Wheeler argued that the State had not adequately proved that he possessed the indicted images because the State failed to establish that he even viewed the images.

## H. *The Motion for Judgment of Acquittal*

Between the close of evidence and closing arguments, Wheeler filed his Motion for Judgment of Acquittal. On December 22, 2014, the Superior Court denied Wheeler's Motion for Judgment of Acquittal, finding Wheeler guilty of each of the 25 indicted counts of Dealing in Child Pornography. The trial court concluded that the evidence demonstrated that "Wheeler developed a pattern of Internet browsing for child

---

[35] A252 (Tr. 80:7-13).
[36] A253 (Tr. 82:22:-83:5).

pornography."[37]  In part, the trial court reasoned that "[t]he sheer number of images . . . supports the reasonable inference that Mr. Wheeler intentionally, as opposed to inadvertently, possessed child pornography."[38]

On April 24, 2015, Wheeler was sentenced to 50 years at Level V.  Two days later, on April 26, 2015, Wheeler filed his Notice of Appeal in this Court.

## I.  *Proceedings Before this Court*

Wheeler appeals from the Superior Court's denial of both of his motions, although he focuses primarily on the trial court's denial of his Motion to Suppress.  As to the Motion to Suppress, he contends that the Superior Court erred because:  (1) the Affidavits failed to establish probable cause that he committed the alleged witness tampering crimes; (2) the State deliberately and recklessly omitted information from the Affidavits that was material to the Issuing Judge's probable cause determination; (3) the Affidavits failed to establish the required nexus between evidence of witness tampering and the items to be searched for and seized; and (4) the Witness Tampering Warrants were unconstitutionally overbroad.

---

[37] *State v. Wheeler*, 2014 WL 7474234, at *13 (Del. Super. Dec. 22, 2014) [hereinafter, "*Wheeler II*, 2014 WL 7474234, at __"].  Although the State filed no charges relating to 2,000 images of child pornography and 3,000 images of child erotica discovered across Wheeler's digital universe, it argued that these images were evidence of Wheeler's intentional possession, receipt, and compilation of the 25 charged images.  Further, although the record is not entirely clear, the State contends that these images were downloaded from the Internet through the use of newsgroups.  Ans. Br. 5.  The trial court relied upon the 2,000 images of child pornography as evidence that Wheeler intentionally, as opposed to inadvertently, possessed the 25 charged images.  *Wheeler II*, 2014 WL 7474234, at *13.  Sergeant Perna found a program called "NetShred X" on certain of Wheeler's devices.  According to Sergeant Perna, NetShred X is a program that erases a user's *Internet* activity from the computer's hard drive.  *See* A242 (Tr. 37:10-14).  Notably, the State agrees that this is not an Internet case.
[38] *Wheeler II*, 2014 WL 7474234, at *13.

Because we conclude that the Witness Tampering Warrants are prohibited general warrants, we do not reach Wheeler's assertion that no probable cause existed to issue the Witness Tampering Warrants. We briefly address it only insofar as it bears on the constitutional analysis and provides useful context.

The witness tampering charges relate to three individuals: NK and two of the W brothers. As to NK, the Affidavits suggest that he never reported Wheeler's sexual abuse to the police because "his father would pay him off."[39] But the State conceded during oral argument before this Court that there was likely no evidence of the witness tampering that allegedly occurred in Illinois present in Wheeler's Delaware home or office: according to the State, the police were "not going to find anything regarding [NK], the son."[40]

That leaves the W brothers' allegations as a possible basis for justifying the search and seizure of Wheeler's property. As to the W brothers, the Affidavits establish that they initiated communication with Wheeler beginning in July 2013. But Sergeant Perna searched Wheeler's iMac for evidence of witness tampering related to such communication, despite the fact that the iMac had not been powered on since September 2012. Upon discovering that the iMac had last been turned on in 2012, Sergeant Perna

---

[39] Wheeler argues that "the [A]ffidavits do not allege that any witness tampering of [NK] occurred in Delaware or within 5 years to satisfy [Delaware's] statute of limitations." Op. Br. 20. The record evidence indicates that Wheeler's alleged "pay offs" to NK occurred in Illinois, years before the underlying search. Specifically, the Affidavits suggest that this conduct occurred when Wheeler and NK lived in Illinois, but do not indicate whether NK provided the Bluffton Police with particular dates as to when the pay offs were made. Nor was any evidence presented to this Court showing that such payments were made.

[40] Oral Argument at 40:25.

should have terminated his forensic examination of the device since it could not contain information from the relevant time frame.

Further, Wheeler argues that none of the evidence presented creates a reasonable inference that he acted "knowingly and with malice."[41]  In his July 20, 2013 letter to Wheeler, SW first raised the matter of restitution and Wheeler responded that he would wait to hear from SW "about further appropriate steps towards resolution and restitution." Whether an offer of civil restitution forms a sufficient basis for witness tampering and intimidation charges—such that it establishes that the offeror acts knowingly and with malice in attempting to undermine any trial, proceeding, or inquiry—presents a question, where, as here, the offer of restitution is responsive to a request from the potential witness, is accompanied by an admission of guilt, and does not indicate an intention to prevent the potential witness from contacting law enforcement.  We do not address these other important arguments, since we think it is clear that the challenged warrants were of a kind which it was the purpose of the Fourth Amendment to forbid—general warrants. Thus, even accepting for the sake of argument that the Witness Tampering Warrants were issued upon probable cause, the order denying the Motion to Suppress must be reversed.

[41] *See* 11 *Del. C.* § 1263 ("A person is guilty of tampering with a witness when: . . . (3) The person knowingly intimidates a witness or victim under circumstances set forth in subchapter III of Chapter 35 of this title.").  A person is guilty of the Act of Intimidating a Witness when that person "knowingly and with malice attempts to prevent another person who has been the victim of a crime, or a witness to a crime (or any person acting on behalf of a victim or witness) from" engaging in certain enumerated acts related to the administration or enforcement of the law. *See* 11 *Del. C.* § 3532.

Wheeler also raises a reverse-*Franks* claim pursuant to the United States Supreme Court's decision in *Franks v. Delaware*, 438 U.S. 154 (1978).  He contends that the State intentionally or recklessly omitted material information from the Affidavits.  Because we find that the Witness Tampering Warrants are unconstitutionally general, we also need not reach this issue.

21

## II.    ANALYSIS

In assessing Wheeler's challenge to the Witness Tampering Warrants on the grounds that they violated the Fourth Amendment to the United States Constitution and Article I, § 6 of the Delaware Constitution, we review such alleged constitutional violations *de novo*.[42]   We also apply *de novo* review to the Superior Court's legal conclusions when reviewing the denial of a motion to suppress.[43]   "We review the Superior Court's factual findings to determine 'whether there was sufficient evidence to support the findings and whether those findings were clearly erroneous.'"[44]

### A.    *The Fourth Amendment to the United States Constitution, Article I, § 6 of the Delaware Constitution, and 11* Del. C. *§ 2307(a)*

The Fourth Amendment to the United States Constitution provides:  "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."[45]   The United States Supreme Court has observed that "the ultimate touchstone of the Fourth Amendment is 'reasonableness[.]'"[46]

Similarly, Article I, § 6 of the Delaware Constitution provides:  "The people shall be secure in their persons, houses, papers and possessions, from unreasonable searches

---

[42] *Bradley v. State*, 51 A.3d 423, 433 (Del. 2012) (citing *Swan v. State*, 28 A.3d 362, 382 (Del. 2011); *LeGrande v. State*, 947 A.2d 1103, 1107 (Del. 2008)).
[43] *Id.* (citing *Lopez-Vazquez v. State*, 956 A.2d 1280, 1284-85 (Del. 2008)).
[44] *Id.* (quoting *Lopez-Vazquez*, 956 A.2d at 1285).
[45] U.S. Const. amend. IV.
[46] *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (citations omitted).

22

and seizures; and no warrant to search any place, or to seize any person or thing, shall issue without describing them as particularly as may be; nor then, unless there be probable cause supported by oath or affirmation."[47]   In addition to the Delaware Constitution, 11 *Del. C.* § 2307(a), in part, provides:  "The warrant shall designate the house, place, conveyance or person to be searched, and shall describe the things or persons sought *as particularly as possible*."[48]

### 1.    *Our Founding Fathers Rejected "General Warrants"*

Our nation's constitutional history and jurisprudence reflects a long-standing hostility towards general warrants.   General warrants, when employed by the government, afford officials "blanket authority" to indiscriminately search persons, houses, papers, and effects.[49]   The United States Supreme Court has characterized "the specific evil" of the general warrant abhorred by the colonists as "a general, exploratory rummaging in a person's belongings."[50]   By contrast, a warrant that is simply overly

---

[47] Del. Const. art. I, § 6.

[48] 11 *Del. C.* § 2307(a) (emphasis added).

[49] *Stanford v. Texas*, 379 U.S. 476, 481 (1965); *see also United States v. Tracey*, 597 F.3d 140, 154 (3d Cir. 2010) ("Examples of general warrants are those authorizing searches for and seizures of such vague categories of items as 'smuggled goods,' 'obscene materials,' 'books, records, pamphlets, cards, receipts, lists, memoranda, pictures, recordings and other written instruments . . .,' 'illegally obtained films,' and 'stolen property.'") (internal quotation marks omitted) (citation omitted).

[50] *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971) (citing *Boyd v. United States*, 116 U.S. 616, 624-30 (1886); *Marron v. United States*, 275 U.S. 192, 195-96 (1927); *Stanford*, 379 U.S. 476).

broad "'describe[s] in both specific and inclusive generic terms what is to be seized,' but it authorizes the seizure of items as to which there is no probable cause."[51]

The aversion to general warrants stems from the founding generation's pre-revolutionary experiences with England.[52]   As early as 1685, the English Parliament objected to the Crown's use of broad searches to limit freedom of the press.[53]   In 1765, an English court denounced this practice in the well-known *Entick v. Carrington*[54] case, where a London publisher successfully sued for trespass after his home was searched pursuant to a general warrant.[55]

During the colonial era, the English issued writs of assistance upon mere suspicion and gave customs officials blanket authority to search where they pleased for smuggled goods and evidence of libel in the homes of colonists.[56]   In 1761, a group of Boston merchants, represented by James Otis, Jr., unsuccessfully contested the issuance of new

---

[51] *United States v. Ninety-Two Thousand Four Hundred Twenty-Two Dollars & Fifty-Seven Cents ($92,422.57)*, 307 F.3d 137, 149 (3d Cir. 2002) (Alito, J.) (alteration in original) (quoting *United States v. Christine*, 687 F.2d 749, 753-54 (3d Cir. 1982)).

[52] The roots of this aversion are far more extensive.  It stems from "a struggle against oppression which had endured for centuries."  *Stanford*, 379 U.S. at 482 ("[I]t would be a needless exercise in pedantry to review again the detailed history of the use of general warrants as instruments of oppression from the time of the Tudors, through the Star Chamber, the Long Parliament, the Restoration, and beyond.").

[53] 1 WAYNE R. LAFAVE, SEARCH & SEIZURE § 1.1(a) (5th ed.) (citing F. SIEBERT, FREEDOM OF THE PRESS IN ENGLAND: 1476-1776 48, 84-85, 173-76 (1952); N. LASSON, THE HISTORY AND DEVELOPMENT OF THE FOURTH AMENDMENT TO THE UNITED STATES CONSTITUTION 38–39 (1937) (noting that Parliament recognized "the idea that general warrants were an arbitrary exercise of governmental authority against which the public had a right to be safeguarded")).

[54] 19 Howell's St. Tr. 1029 (1765).

[55] *See Boyd*, 116 U.S. at 625-26 (discussing *Carrington* and a similar case, *Wilkes v. Wood*); LAFAVE, § 1.1(a) (citing *Carrington*, 19 Howell's St. Tr. 1029).

[56] *Boyd*, 116 U.S. at 625-26 (noting the English government's practice of "searching private houses for the discovery and seizure of books and papers that might be used to convict their owner of the charge of libel").

writs.[57]  John Adams witnessed Otis's arguments at the Old State House in Boston.[58]  As Adams later reported, the crowd departed "ready to take arms against writs of assistance. . . . Then and there the Child Independence was born."[59]  The United States Supreme Court has characterized Otis's denunciation of the Crown's search power as "perhaps the most prominent event which inaugurated the resistance of the colonies to the oppressions of the mother country."[60]

The Fourth Amendment "'grew directly out of the events which immediately preceded the revolutionary struggle with England.'"[61]  Its passage "was the founding generation's response to the reviled 'general warrants' and 'writs of assistance' of the colonial era, which allowed British officers to rummage through homes in an unrestrained search for evidence of criminal activity."[62]  Indeed, initial efforts at crafting a Federal Constitution met strong opposition due, in part, to the drafters' failure to impose limits on the government's power to search.[63]  These objections ultimately led to the inclusion of the Fourth Amendment in the Federal Bill of Rights.[64]

---

[57] LAFAVE, § 1.1(a).

[58] *Id.*

[59] *Id.* (quoting 10 C. ADAMS, THE LIFE AND WORKS OF JOHN ADAMS 247–48 (1856)) (alteration in original) (internal quotation marks omitted).

[60] *Boyd*, 116 U.S. at 625.

[61] LAFAVE, § 1.1(a) (quoting J. LANDYNSKI, SEARCH AND SEIZURE AND THE SUPREME COURT 19 (1966)).

[62] *Riley v. California*, 134 S. Ct. 2473, 2494 (2014).

[63] LAFAVE, § 1.1(a) (citing LASSON, at 92–96).

[64] *Cf. Mason v. State*, 534 A.2d 242, 246-47 n.10 (Del. 1987) ("The amendment in the Bill of Rights concerning searches and seizure was framed and adopted with the fresh recollection of the debates on writs of assistance and the Revolution which followed.") (citing *Davis v. United States*, 328 U.S. 582, 605 (1946) (Frankfurter, J., dissenting)); *id.* at 246 ("The Framers were aware of the attempts that had been made by representatives of the King of England, both in

## 2. *Delaware's Search and Seizure Protections*

The search and seizure protections in the Delaware Constitution preceded the adoption of the Fourth Amendment.[65] In 1776, Delaware adopted its own constitutional protections against general warrants[66] and embraced the first search and seize safeguards for its citizens.[67] The Declaration of Rights and Fundamental Rules of the Delaware State provided:

> Sect. 17. That all warrants without oath to search suspected places, or to seize any person or his property, are grievous and oppressive; and all general warrants to search suspected places, or to apprehend all persons suspected, without naming or describing the place or any person in special, are illegal and ought not to be granted.[68]

This provision was the antecedent to the provision now found in Article I, § 6 of the present Delaware Constitution.

On January 28, 1790, Delaware ratified the Bill of Rights to the United States Constitution.[69] But when Delaware subsequently adopted a new State Constitution in 1792, it closely tracked the language of the Pennsylvania Constitution of 1790.[70] In previous cases, this Court has held that our Constitution affords our citizens protections

---

England and in the American colonies, to exceed laws which confined governmental powers to search.").

[65] *Id.* at 247 ("Delaware's protections against unreasonable searches and seizures predate those which are provided for in the Fourth Amendment."); *see also Jones v. State*, 745 A.2d 856, 865 (Del. 1999).

[66] *See Dorsey v. State*, 761 A.2d 807, 815-16 (Del. 2000).

[67] *See Jones*, 745 A.2d at 865.

[68] *Id.*

[69] *Id.* (citation omitted).

[70] *Id.* at 865-66.

somewhat greater than those of the Fourth Amendment.[71]  Here, the challenged Witness Tampering Warrants violate both the United States and Delaware Constitutions.

The warrant requirement addresses the Framers' concerns in two ways.  "*First*, the magistrate's scrutiny is intended to eliminate altogether searches not based on probable cause."[72]  *Second*, the warrant requirement ensures that "those searches deemed necessary [are] as limited as possible[,]" as the evil of unrestrained searches "is not that of intrusion per se, but of a general, exploratory rummaging in a person's belongings."[73]

The second objective is achieved by enforcing the particularity requirement of the Fourth Amendment.  The warrant must describe the things to be searched with sufficient particularity and be no broader than the probable cause on which it is based.[74]  "The manifest purpose of this particularity requirement [i]s to prevent general searches.  By limiting the authorization to search to the specific areas and things for which there is probable cause to search, the requirement ensures that the search will be carefully tailored

---

[71] For instance, we note three cases in which this Court held that our State Constitution provides somewhat broader constitutional protections.  *First*, despite observing that the language of the Fourth Amendment and Article I, § 6 is "nearly identical," we have held that "the Delaware Constitution provides a greater protection for the individual than the United States Constitution in the determination of whether a seizure by the State has occurred."  *Flonnory v. State*, 805 A.2d 854, 857 (Del. 2001) (citing *Jones*, 745 A.2d at 863-64).  *Second*, in *Dorsey v. State*, this Court held that the "good faith" exception to the exclusionary rule did not apply in Delaware because "exclusion is the constitutional remedy for a violation of the search and seizure protections set forth in Article I[,] Section 6 of the Delaware Constitution."  *Dorsey*, 761 A.2d at 821 (citing *Jones*, 745 A.2d at 873-74) (citation omitted).  *Third*, for more than 150 years, "a Delaware statute has required *more* than probable cause for the issuance of a nighttime search warrant."  *Id.* at 819 (citing *Mason*, 534 A.2d at 248) (emphasis in original).

[72] *Coolidge*, 403 U.S. at 467 (emphasis added).

[73] *Id.* (citing *Boyd*, 116 U.S. at 624-30; *Marron*, 275 U.S. at 195-96; *Stanford*, 379 U.S. 476).

[74] *United States v. Zimmerman*, 277 F.3d 426, 432 (3d Cir. 2002) (citation omitted).

to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit."[75]

**B.** ***The Particularity Requirement Presents Difficult Challenges in the Context of Computer Searches***

Warrants directed to digital information present unique challenges in satisfying the particularity requirement, given the unprecedented volume of private information stored on devices containing such data.[76]  The expansive universe of digital and electronic information, and the intermingling data, complicates balancing the privacy interests of our citizens and the legitimate efforts of law enforcement in investigating criminal activity.[77]

The United States Supreme Court, in *Riley v. California*,[78] recognized the enormous potential for privacy violations flowing from unconstrained searches of cell phones.[79]  The *Riley* Court, in considering a warrantless search of a cell phone, observed that, much like a computer search, "[a cell] phone not only contains in digital form many

---

[75] *Maryland v. Garrison*, 480 U.S. 79, 84 (1987) (citations omitted); *see also Arizona v. Gant*, 556 U.S. 332, 345 (2009) ("[T]he central concern underlying the Fourth Amendment [is] the concern about giving police officers unbridled discretion to rummage at will among a person's private effects.") (citations omitted).

[76] *See Riley*, 134 S. Ct. at 2494-95 ("Modern cell phones are not just another technological convenience.  With all they contain and all they may reveal, they hold for many Americans 'the privacies of life[.]'") (quoting *Boyd*, 116 U.S. at 630).

[77] *Cf. Kyllo v. United States*, 533 U.S. 27, 33-34 (2001) (Scalia, J.) ("It would be foolish to contend that the degree of privacy secured to citizens by the Fourth Amendment has been entirely unaffected by the advance of technology.").

[78] 134 S. Ct. 2473 (2014).

[79] *See id.* at 2489 ("Cell phones differ in both a quantitative and a qualitative sense from other objects that might be kept on an arrestee's person.  The term 'cell phone' is itself misleading shorthand; many of these devices are in fact minicomputers that also happen to have the capacity to be used as a telephone.  They could just as easily be called cameras, video players, rolodexes, calendars, tape recorders, libraries, diaries, albums, televisions, maps, or newspapers.").

sensitive records previously found in the home; it also contains a broad array of private information never found in a home in any form . . . ."[80]  As the Supreme Court acknowledged in *Riley*, digital searches permit the government access to "far *more* than the most exhaustive search of a house . . . ."[81]

The United States Constitution "specifies only two matters that must be 'particularly describ[ed]' in the warrant:  'the place to be searched' and 'the persons or things to be seized.'"[82]  Satisfying the particularity requirement is difficult in the electronic search warrant context, given the commingling of relevant and irrelevant information and the complexities of segregating responsive files *ex ante*.  As the United States Court of Appeals for the Third Circuit observed, "it would be 'folly for a search warrant to structure the mechanics of the search' because 'imposing such limits would unduly restrict legitimate search objectives . . . .'"[83]  Nonetheless, in an oft-quoted passage of *Marron v. United States*,[84] the United States Supreme Court observed that "[t]he requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another.  As to what is to be taken, nothing is left to the discretion of the officer executing the warrant."[85]  Accordingly, the United States Supreme Court has

---

[80] *Id.* at 2491.

[81] *Id.* (emphasis in original).

[82] *United States v. Grubbs*, 547 U.S. 90, 97 (2006) (alteration in original).

[83] *United States v. Stabile*, 633 F.3d 219, 238 (3d Cir. 2011) (quoting *United States v. Burgess*, 576 F.3d 1078, 1094 (10th Cir. 2009), *cert. denied*, 558 U.S. 1097 (2009)), *cert. denied*, 132 S. Ct. 399 (2011).

[84] 275 U.S. 192 (1927).

[85] *Id.* at 196.

suggested that warrants that fail to describe the specific crime that has been or is being committed do not satisfy the particularity requirement.[86]

Warrants "must be tested by courts in a commonsense and realistic fashion," and reviewing courts should avoid a "hypertechnical approach."[87]  The majority of Federal Courts of Appeals have rejected the suggestion of requiring specific computer search protocols.  For example, in *United States v. Richards*,[88] the Court of Appeals for the Sixth Circuit observed that:

> [G]iven the unique problem encountered in computer searches, and the practical difficulties inherent in implementing universal search methodologies, the majority of federal courts have eschewed the use of a specific search protocol and, instead, have employed the Fourth Amendment's bedrock principle of reasonableness on a case-by-case basis: While officers must be clear as to what it is they are seeking on the computer and conduct the search in a way that avoids searching files of types not identified in the warrant, . . . a computer search may be as extensive as reasonably required to locate the items described in the warrant based on probable cause.[89]

---

[86] *See, e.g.*, *Berger v. New York*, 388 U.S. 41, 55-56 (1967) ("The Fourth Amendment commands that a warrant issue not only upon probable cause supported by oath or affirmation, but also 'particularly describing the place to be searched, and the persons or things to be seized.'  [The scrutinized] statute lacks this particularization. . . .  It lays down no requirement for particularity in the warrant as to what specific crime has been or is being committed, nor 'the place to be searched,' or 'the persons or things to be seized' as specifically required by the Fourth Amendment.").  Here, while the Applications and Affidavits refer to the crimes alleged, the Witness Tampering Warrants do not.

[87] *Christine*, 687 F.2d at 760 (citations omitted) (internal quotation marks omitted).

[88] 659 F.3d 527 (6th Cir. 2011), *cert. denied*, 132 S. Ct. 2726 (2012).

[89] *Id.* at 538 (citations omitted) (internal quotation marks omitted).  *But see In re Search Warrant*, 71 A.3d 1158 (Vt. 2012) (drawing from the guidelines set forth in *United States v. Comprehensive Drug Testing, Inc. (CDT I)*, 579 F.3d 989 (9th Cir. 2009) and the concurring Opinion in *United States v. Comprehensive Drug Testing, Inc. (CDT II)*, 621 F.3d 1162 (9th Cir. 2010) (*en Banc*) (*per curiam*) (Kozinski, C.J., concurring) regarding imposing *ex ante* limitations on computer searches)), *cert. denied*, 133 S. Ct. 2391 (2013).

Some irrelevant files may have to be at least cursorily perused to determine whether they are within the authorized search ambit. Accordingly, the proper metric of sufficient specificity is whether it was reasonable to provide a more specific description of the items at that juncture of the investigation.[90]

Further, the propensity of criminals to disguise files must be balanced against the competing interest of avoiding unrestrained general searches: "It is unrealistic to expect a warrant to prospectively restrict the scope of a search by directory, filename or extension or to attempt to structure search methods—that process must remain dynamic."[91] "[I]t is clear that because criminals can—and often do—hide, mislabel, or manipulate files to conceal criminal activity, a broad, expansive search of the hard drive may be required."[92] Consequently, it would likely unduly restrict law enforcement to require the crafting of specific keyword searches or identification of file names and extensions *ex ante*. In some instances, the technological reality may be that, "in the end, there may be no practical substitute for actually looking in many (perhaps all) folders and sometimes at the documents contained within those folders, and that is true whether the

---

[90] *See, e.g.*, *Christine*, 687 F.2d at 760 ("[T]he use of generic classifications in a warrant is acceptable when a more precise description is not feasible.") (citations omitted).

[91] *Burgess*, 576 F.3d at 1093 ("While file or directory names may sometimes alert one to the contents . . ., illegal activity may not be advertised even in the privacy of one's personal computer—it could well be coded or otherwise disguised." (footnote omitted)).

[92] *Stabile*, 633 F.3d at 237 (citing *Burgess*, 576 F.3d at 1092-94).

search is of computer files or physical files."[93]  "[N]o tenet of the Fourth Amendment prohibits a search merely because it cannot be performed with surgical precision."[94]

This Court has addressed Fourth Amendment challenges in the digital context on two occasions.  But in neither case did we confront directly a challenge that a warrant seeking digital information failed to satisfy the particularity requirement in the United States and Delaware Constitutions.

In the more recent of the cases, *Bradley v. State*,[95] we considered whether the search exceeded the scope of the warrants, but not whether the warrants were unconstitutionally general.  Bradley argued, among other things, that the police exceeded the scope of the warrant in executing the instrument and that the supporting affidavit failed to establish probable cause that patient files would be found in digital format.  This Court concluded that "the computers and digital storage devices could reasonably contain the patient files described in the warrant, whether in text or image form."[96]  Thus, in *Bradley*, there was no basis for segregating text files from other types of files because probable cause allowed for the search of both.

Likewise, in the earlier case of *Fink v. State*,[97] the State obtained a warrant to search the residence and automobile of the defendant, who was an attorney, for "client files including but not limited to" specifically listed clients and the personal banking

---

[93] *Burgess*, 576 F.3d at 1094; *see also Ninety-Two Thousand*, 307 F.3d at 150 (suggesting that, in some instances, it may be "necessary to search for and seize all" files when executing a search warrant).
[94] *Christine*, 687 F.2d at 760.
[95] 51 A.3d 423 (Del. 2012).
[96] *Id.* at 435.
[97] 817 A.2d 781 (Del. 2003).

records of the defendant. During the execution of the third of three search warrants, the police recovered a computer compact disk and three zip disks, each of which contained child pornography. The defendant argued that the warrant lacked sufficient particularity and that the words, "client files including but not limited to," were overly broad and failed to adequately limit the search to those items for which probable cause had been established. This Court rejected the overbreadth claim, since the defendant's financial dealings at issue "effectively opened all his financial records to potential scrutiny by the police."[98] Accordingly, we held that "the warrant's authorized search did not unreasonably exceed a logical scope of inquiry."[99] However, this Court did not more directly address the permissible scope of warrants seeking digital information.[100]

Thus, we consider more directly, for the first time, a challenge to warrants seeking to seize and search computer-based and digital items on the grounds that they are in the nature of a general warrant, unconstitutionally overbroad, and lack sufficient particularity. We have considered how other courts have addressed similar claims. In

---

[98] *Id.* at 787.

[99] *Id.*; *see also United States v. Am. Investors of Pittsburgh, Inc.*, 879 F.2d 1087, 1105-06 (3d Cir. 1989) ("The fact that the warrant authorized a search for a large amount of documents and records does not necessarily render the search invalid so long as there exists a sufficient nexus between the evidence to be seized and the alleged offenses.").

[100] In *Starkey v. State*, 2013 WL 4858988 (Del. Sept. 10, 2013), this Court addressed a claim that the search warrants at issue were overbroad, ambiguous, and failed to provide the relevance of the defendant's "cell phone files" to the alleged crimes. This Court rejected the claim that the warrants were vague since "they specifically limited the officer's search of the cell phones to certain types of data, media, and files that were 'pertinent to th[e] investigation.'" *Id.* at *4. We held that "[t]his language effectively limited the scope of the warrants, and prevented a boundless search of the cell phones." *Id.* (citing *Fink*, 817 A.2d at 786).

*United States v. Riccardi*,[101] for example, the United States Court of Appeals for the Tenth Circuit considered whether a warrant to seize and examine a defendant's computer failed to satisfy the Fourth Amendment's particularity requirement. There, the defendant was convicted of two counts of possession of child pornography and two counts of use of an instrumentality of interstate commerce to entice a minor to engage in a prohibited sex act.

The Tenth Circuit held that the challenged warrant failed to satisfy the Fourth Amendment's particularity requirement. It stated that the warrant "was not limited to any particular files, or to any particular federal crime. The warrant authorized the 'seizure' of [the defendant's] computer"

> and all electronic and magnetic media stored therein, together with all storage devises [*sic*], internal or external to the computer or computer system, including but not limited to floppy disks, diskettes, hard disks, magnetic tapes, removable media drives, optical media such as CD–ROM, printers, modems, and any other electronic or magnetic devises [*sic*] used as a peripheral to the computer or computer system, and all electronic media stored within such devises [*sic*].[102]

The Tenth Circuit observed that, "[b]y its terms, the warrant thus permitted the officers to search for anything—from child pornography to tax returns to private correspondence. It seemed to authorize precisely the kind of 'wide-ranging exploratory search[] that the Framers intended to prohibit.'"[103] Ultimately, however, the Tenth Circuit affirmed the

---

[101] 405 F.3d 852 (10th Cir. 2005), *cert. denied*, 546 U.S. 919 (2005), *petition for reh'g denied*, 546 U.S. 1083 (2005); *see also United States v. Galpin*, 720 F.3d 436, 448 (2d Cir. 2013) (finding that an electronic search warrant related to a registration offense was facially overbroad, in part, because it "authorized a search for images depicting child sexual activity").

[102] *Riccardi*, 405 F.3d at 862.

[103] *Id.* at 863 (quoting *Garrison*, 480 U.S. at 84).

trial court's decision that the evidence seized pursuant to the invalid warrant need not be suppressed, on the basis of the good faith exception to the exclusionary rule.[104]

Recently, in *State v. Castagnola*,[105] the Supreme Court of Ohio considered the application of the particularity requirement of the Fourth Amendment to the search of a computer. There, the initial search warrant related to the crimes of retaliation, criminal trespassing, criminal damaging, and possession of criminal tools.[106] The warrant sought the following:

> Records and documents either stored on computers, ledgers, or any other electronic recording device to include hard drives and external portable hard drives, cell phones, printers, storage devices of any kind, printed out copies of text messages or emails, cameras, video recorders or any photo imaging devices and their storage media to include tapes, compact discs, or flash drives.[107]

Looking for "evidence of intimidation" on the defendant's computer, the forensic examiner used a software program that "go[es] through documents, images, videos on the hard drive."[108] The examiner also performed a keyword search that did not yield any responsive results, before proceeding to open a tab that maintained "all the images associated with the drive being examined."[109] After accessing the tab, the examiner discovered images that she thought were child pornography, stopped her investigation, and applied for another warrant. When performing a search based on the second search

---

[104] *Id.* at 863-64.

[105] 2015 WL 1934723 (Ohio Apr. 28, 2015).

[106] *Id.* at *2. The forensic examiner in *Castagnola* testified that the defendant's computer "was brought in for [a case involving] menacing, threatening, and intimidation." *Id.* at *3 (alteration in original).

[107] *Id.* at *16.

[108] *Id.* at *3 (internal quotation marks omitted) (alteration in original).

[109] *Id.* (internal quotation marks omitted).

warrant, the forensic examiner discovered "over a thousand videos and images of suspected child pornography."[110]

In considering the defendant's motion to suppress,[111] the Supreme Court of Ohio scrutinized the instrument's grant of authority to search and seize "[r]ecords and documents . . . stored on computers," finding that its plain language "demonstrate[d] that there [wa]s no limitation on what records and documents were to be searched for in [the defendant's] computer."[112] The court held that the challenged search warrant failed to satisfy the particularity requirement for two reasons. *First*, "the language of the search warrant did not 'guide and control' [the forensic examiner's] judgment as to what was to be seized on the computer[,]" leaving the determination as to what to seize within the discretion of the examiner.[113] *Second*, "the broad language of th[e] search warrant clearly included items that were not subject to seizure[,]" such that the instrument was not as specific as "the circumstances and the nature of the activity under investigation permitted . . . ."[114]

The Ohio Supreme Court rejected the idea that the Fourth Amendment required a search warrant to specify restrictive search protocols. But it also recognized "that the Fourth Amendment does prohibit a 'sweeping comprehensive search of a computer's

---

[110] *Id.*

[111] Notably, *Castagnola* involved a single warrant that was first used to search the defendant's house in order to seize the computers. *Id.* at *15. The warrant was obtained a second time to search the contents of the defendant's computers for evidence relating to child pornography. *Id.* at *3.

[112] *Id.* at *16.

[113] *Id.* at *17.

[114] *Id.* (citing *Guest v. Leis*, 255 F.3d 325, 336 (6th Cir. 2001)).

hard drive.'"[115]  The guiding metric applied by the court was that "officers must describe

what they believe will be found on a computer with as much specificity as possible under

the circumstances[,]" and that "[t]his will enable the searcher to narrow his or her search

to only the items to be seized."[116]  With this guidance, we turn to the warrants at issue

here.

**C.**      ***The Witness Tampering Warrants Were General Warrants and Violated the
Particularity Requirement***

1.      *The Witness Tampering Warrants Have No Temporal Limitations, Despite
Relevant Dates Being Available to the Police*

A key principle distilled from the jurisprudence in this area is that warrants, in

order to satisfy the particularity requirement, must describe what investigating officers

believe will be found on electronic devices with as much specificity as possible under the

circumstances.  That principle simply was not followed here in several respects.  One

obvious respect was the failure to limit the search to the relevant time frame.  Federal

Courts of Appeals have concluded that warrants lacking temporal constraints, where

relevant dates are available to the police, are insufficiently particular.[117]  Our sister courts

---

[115] *Id.* at *18 (citation omitted).

[116] *Id.*

[117] *See, e.g.*, *United States v. Abboud*, 438 F.3d 554, 576 (6th Cir. 2006) (citation omitted)
(stating that a warrant was overbroad because it "[f]ail[ed] to limit broad descriptive terms by
relevant dates, when such dates [were] available to the police"); *United States v. Ford*, 184 F.3d
566, 576 (6th Cir. 1999) (citations omitted) ("Failure to limit broad descriptive terms by relevant
dates, when such dates are available to the police, will render a warrant overbroad."), *cert.
denied*, 528 U.S. 1161 (2000); *United States v. Kow*, 58 F.3d 423, 427 (9th Cir. 1995)
(admonishing the government for failing to "limit the scope of the seizure to a time frame within
which the suspected criminal activity took place, even though . . . [the supporting] affidavit
indicate[d] that the alleged criminal activity began" at a specified point in time).  *Cf. United
States v. Karrer*, 460 F. App'x 157, 161 (3d Cir. 2012) (citing *United States v. Yusuf*, 461 F.3d
374, 395 (3d Cir. 2006)) (concluding that a warrant was not a general warrant, as it "sufficiently

have similarly considered temporal restrictions in the context of the particularity requirement.[118] Ultimately, "[i]t is settled law that generic classifications in a warrant are acceptable only when a more precise description is not possible."[119]

We hesitate to prescribe rigid rules and instead reiterate that warrants must designate the things to be searched and seized as particularly as possible. Striking the correct balance when protecting against generality and overbreadth requires vigilance on the part of judicial officers who are on the front lines of preserving constitutional rights while assisting government officials in the legitimate pursuit of prosecuting criminal activity. Where, as here, the investigators had available to them a more precise description of the alleged criminal activity that is the subject of the warrant, such information should be included in the instrument and the search and seizure should be

_____

identified a time period during which the suspected offenses occurred"). *But compare Ninety-Two Thousand*, 307 F.3d at 151 (Alito, J.) ("At most, the lack of time restrictions meant that the warrant was overly broad, not general. . . . In any event, the absence from the warrant of a provision limiting the search and seizure to documents pertaining to the time period of the scheme did not make the warrant 'so facially deficient' 'as to render official belief in its [legality] entirely unreasonable.'") (internal citation omitted) (alteration in original), *with id.* at 156 (Ambro, J., dissenting) (arguing that failure to limit the temporal scope of a warrant, when relevant dates are available to the police, is a "deficiency" that underlies an "unconstitutionally broad warrant") (citing *Ford*, 184 F.3d at 576).

[118] *See, e.g.*, *In re Search Warrant*, 71 A.3d at 1183-84 (observing that a magistrate may properly restrict law enforcement's search to items that meet certain parameters based on, *inter alia*, dates and "the known details of the suspected crime such as the time-period"); *Commonwealth v. McDermott*, 864 N.E.2d 471, 487 (Mass. 2007) (rejecting an argument that a warrant was overbroad where the challenged category of items was limited both in time frame and in the nature of the items that could be seized), *cert. denied*, 552 U.S. 910 (2007).

[119] *United States v. Bright*, 630 F.2d 804, 812 (5th Cir. 1980) (citing *James v. United States*, 416 F.2d 467, 473 (5th Cir. 1969), *cert. denied*, 397 U.S. 907 (1970)).

appropriately narrowed to the relevant time period so as to mitigate the potential for unconstitutional exploratory rummaging.[120]

The State conceded that nothing relating to NK would be found on Wheeler's property identified in the Witness Tampering Warrants. And the Affidavits do not suggest otherwise. As to the only other potential victims, the W brothers, the Affidavits indicate that the alleged witness tampering occurred, if it did, in or after July 2013, since that was when the W brothers renewed contact with Wheeler.[121] The Affidavits contain no facts suggesting that any tampering might have occurred prior to July 2013. Yet, the Witness Tampering Warrants were boundless as to time. Sergeant Perna testified that one of the first things he did in executing the search was determine when the iMac was last used. Proceeding under the Witness Tampering Warrants, he determined that the computer had last been powered on in September 2012. However, the State unsystematically sifted through Wheeler's digital universe, even though the iMac logically could not have contained material created or recorded during the relevant time period.

A failure to describe the items to be searched for and seized with as much particularity as the circumstances reasonably allow offends the constitutional protections against unreasonable searches and seizures. Because the State was able to more precisely describe the items to be searched and seized, the Witness Tampering Warrants violated the particularity requirement.

---

[120] *See id.*; *Ford*, 184 F.3d at 576.
[121] The State also conceded at oral argument before this Court that the relevant time period commenced in 2013. *See* Oral Argument at 40:37.

2.      *The Witness Tampering Warrants Likely Fail the Particularity Requirement for Other Reasons*

The Witness Tampering Warrants likely fail the particularity requirement in other respects. For example, nothing in the Affidavits supports an inference that evidence may be found on DVDs or optical cameras. The Affidavits do not allege that Wheeler was communicating with NK or any of the W brothers through videos or pictures. Nor do the Affidavits link witness tampering to these types of media. The likely reason that the Witness Tampering Warrants sought the search for and seizure of devices and items that cannot lead to evidence of witness tampering based on the Affidavits is that, as the State conceded, the language was essentially copied and pasted from a search warrant for child pornography. Although the parties agree that cutting and pasting search warrant language does not automatically invalidate the resulting instrument, that technique has led, in the context of this case, to search warrants that do not satisfy the particularity requirement.[122]

Further, the Affidavits recite that the State was searching for "evidence of written communications," which it believed were relevant to the alleged witness tampering. Sergeant Perna wrote in his forensic report and testified that he was "looking for any files created and/or saved as word documents, emails, text messages, pdf [*sic*] or any other

---

[122] *Cf. Massachusetts v. Sheppard*, 468 U.S. 981, 986-91 (1984) (scrutinizing police use of a form warrant pertaining to an unrelated crime and indicating that it might be insufficiently particular, but ultimately upholding the search based upon the good faith exception to the exclusionary rule notwithstanding the defect). As noted above, the good faith exception to the exclusionary rule is not recognized in Delaware. *See Dorsey*, 761 A.2d at 820-21.

related file format."[123]  The portions of the Affidavits discussing the items sought refer to written communications.[124]  These observations suggest that the items for which there was probable cause to search and seize were written communications—not DVDs and

---

[123] A191 (Tr. 38:10-19).

[124] At oral argument before this Court, the State asserted that it was not relying on incorporation of the Affidavits into the Witness Tampering Warrants for the latter to satisfy the particularity requirement.  Oral Argument at 31:50.  In *Groh v. Ramirez*, 540 U.S. 551 (2004), the United States Supreme Court observed that, although supporting documentation adequately describes the things to be searched for and seized, such description does not necessarily save a *warrant* from its facial invalidity.  *Id.* at 557.  The Supreme Court noted that:  "The Fourth Amendment by its terms requires particularity *in the warrant*, not in the supporting documents."  *Id.* (citations omitted) (emphasis added).  It also stated the following:  "We do not say that the Fourth Amendment prohibits a warrant from cross-referencing other documents.  Indeed, most [Federal] Courts of Appeals have held that a court may construe a warrant with reference to a supporting application or affidavit if the warrant uses appropriate words of incorporation, and if the supporting document accompanies the warrant."  *Id.* at 557-58 (citations omitted).

Some Federal Courts of Appeals have limited *Groh*'s import to establishing that an unconstitutional warrant can be saved by its supporting documentation only if the warrant appropriately references the supporting document through "clear" language of incorporation *and* the supporting document accompanies the warrant.  *See, e.g.*, *United States v. Perez*, 2015 WL 6405695, at *3 (6th Cir. Oct. 23, 2015) (citing *Groh*, 540 U.S. at 557-58); *Tracey*, 597 F.3d at 146-48 (citations omitted) ("Along with other Courts of Appeals, we have held that an affidavit may be used in determining the scope of a warrant that lacks particularity if the warrant is 'accompanied by an affidavit that is incorporated by reference.'"); *United States v. Waker*, 534 F.3d 168, 172-73 (2d Cir. 2008).  Others have held that, for an unconstitutional warrant to be cured through incorporation by reference to an affidavit, the affidavit must not be filed under seal.  *See, e.g.*, *Bartholomew v. Pennsylvania*, 221 F.3d 425, 429-30 (3d Cir. 2000) ("We now make clear . . . and hold that, generally speaking, where the list of items to be seized does not appear on the face of the warrant, sealing that list, even though it is 'incorporated' in the warrant, would violate the Fourth Amendment.").  Here, the Applications and Affidavits indicate that they were filed under seal.

Although the Witness Tampering Warrants, under "ITEMS TO BE SEARCHED FOR AND SEIZED[,]" state in paragraph 1, "[e]nter and search the residence [or office] as completely described herein [*sic*] the application and affidavit for evidence of the aforementioned crime(s)[,]" it is not clear that the broad lists of items in the Witness Tampering Warrants are necessarily *limited* by the Affidavits and, if so, in what fashion.  A19 (Warrant 1 ¶ 1); A31 (Warrant 2 ¶ 1).  This is true particularly in view of the fact that the Affidavits contain sweeping, boilerplate language concerning digital data and the ability of forensic experts to recover it for lengthy periods of time, including "years after it [i]s written."  Thus, even assuming, *arguendo*, that the Affidavits are fairly incorporated, they fail to cure the constitutional defects, as they lack temporal restraints as to all potential victims and fail to guide the executing officers as to the limits of the search and seizure.

optical cameras. Yet, by their terms, the Witness Tampering Warrants permitted the State to search for anything—from child pornography to medical records to consumer information to tax returns. In short, they permitted the species of wide-ranging, exploratory searches the Framers intended to prohibit. Because the lack of temporal limitations is sufficient to invalidate the Witness Tampering Warrants, we need not reach these other potential substantive challenges. Instead, we caution that the risk that warrants for digital and electronic devices take on the character of "general warrants" is substantial. This reality necessitates heightened vigilance, at the outset, on the part of judicial officers to guard against unjustified invasions of privacy.

## III.    CONCLUSION

The subject of this prosecution is an unsympathetic figure. And the sexual exploitation of children is a dreadful scourge in our society. But "[t]he principles laid down in this [O]pinion affect the very essence of constitutional liberty and security. They reach further than the concrete form of the case before the court . . .; they apply to all invasions on the part of the government and its employe[e]s of the sanctity of a [person's] home and the privacies of life."[125] "There is always a temptation in criminal cases to let the end justify the means, but as guardians of the Constitution, we must resist that temptation."[126]

The United States Constitution and the Delaware Constitution both mandate that the decision of the Superior Court with respect to the Motion to Suppress be reversed.

---

[125] *Boyd*, 116 U.S. at 630.
[126] *Castagnola*, 2015 WL 1934723, at *20 (citation omitted) (internal quotation marks omitted).

42

Accordingly, the judgments of conviction are REVERSED.  This matter is remanded for further proceedings in accordance with this Opinion.