# IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| DIAMONTE TAYLOR, | § | |
| | § | No. 91, 2020 |
| Defendant Below, | § | |
| Appellant, | § | Court Below: Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | Cr. ID No. 1605012921A (N) |
| STATE OF DELAWARE, | § | |
| | § | |
| Plaintiff Below, | § | |
| Appellee. | § | |

Submitted: June 16, 2021
Decided: September 8, 2021

Before **SEITZ**, Chief Justice; **VALIHURA**, **VAUGHN**, **TRAYNOR**, and **MONTGOMERY-REEVES**, Justices, constituting this Court *en Banc*.

Upon appeal from the Superior Court of the State of Delaware: **REVERSED** and **REMANDED**.

Benjamin S. Gifford IV, Esquire, Law Office of Benjamin S. Gifford IV, Wilmington, Delaware, *for Defendant Below, Appellant Diamonte Taylor.*

Elizabeth R. McFarlan, Esquire, Delaware Department of Justice, Wilmington, Delaware, *for Plaintiff Below, Appellee State of Delaware.*

**SEITZ**, Chief Justice, for the majority:

A Superior Court jury convicted Diamonte Taylor for gang-related murder and violent felonies. On direct appeal, Taylor claims that the Superior Court should have suppressed evidence from his smartphones collected under an unconstitutional search warrant. Unlimited in time and scope, the general warrant to search Taylor's smartphones violated Taylor's rights under the Fourth Amendment to the United States Constitution, Article I, Section 6 of the Delaware Constitution, and the particularity requirement under Delaware statutory law. The evidence should have been suppressed and the error was not harmless. We reverse his convictions and remand to the Superior Court for a new trial without the taint of the improperly seized evidence.

I.

According to the record on appeal, Taylor was a member of the Wilmington street gang "Shoot to Kill" or "STK."[1] On January 23, 2015, someone murdered an STK affiliate, prompting a feud between STK and a rival Wilmington gang known as "Only My Brothers" or "OMB."[2] Multiple witnesses identified Taylor, who goes by the nickname "Nice" or "D-Nice," and other STK members as participants in a series of violent crimes that occurred throughout New Castle County in May 2016.

---

[1] App to Opening Br. at A0544; A0561; A1054; A1199-1200.
[2] *Id.* at A0544.

Kevon Harris-Dickerson is an admitted STK gang member. He was arrested and pled guilty to several charges related to the May 2016 crime spree.[3] Harris-Dickerson testified that Taylor and Zaahir Smith were members of STK and participated in the May 2016 violence.[4] We summarize the trial testimony about each incident below as they relate to Taylor's charges.

A.

On May 5, 2016, Jonathan Rivera and Gerard McDonald drove to visit Ninti Johnson at her apartment in Newark. Johnson was running an errand when they arrived. Johnson's brother, Smith, who McDonald knew by his nickname "Hotep," was at the apartment with Taylor.[5] Smith asked Rivera and McDonald to take him and Taylor to a nearby gas station while they waited for Johnson. On the way back from the gas station, Smith told Rivera to park behind the apartment complex. Smith then pointed a gun at Rivera and McDonald and demanded that they "run everything."[6] Rivera and McDonald understood this to mean that they were being robbed. They handed over Rivera's laptop, gold watch, black leather wallet, and iPhone 5.[7] After Smith and Taylor left Rivera's car, Rivera and McDonald called the police to report the robbery.

---

[3] *Id.* at A1195-97.
[4] *Id.* at A1195; A1199-1200.
[5] Smith is also known as "Hotep," "Rango," "Grimey Savage," and "Grimey STK." *Id.* at A0564; A0661; A1197.
[6] *Id.* at A0640-41.
[7] *Id.* at A0641; A0650.

Investigators searched Johnson's apartment and found a .38 revolver, a box of Remington .38 ammunition, credit cards in Jonathan Rivera's name, and a debit card in Zaahir Smith's name.[8] Smith's fingerprints matched fingerprints lifted from the ammunition box.[9] Fingerprints recovered from the rear passenger side of Rivera's car matched Taylor's fingerprints.[10] McDonald identified Smith and Taylor in separate photo line-ups. McDonald recognized Taylor from the number "302" tattooed around his eye.[11] Rivera did not make an identification from the photo line-ups but identified Smith in a photo posted to Facebook.[12] An inmate who later shared a cell with Smith testified that Smith admitted to robbing two men who were visiting his sister with a .38 revolver.[13]

## B.

On May 16, 2016, Shango Miller, an affiliate of OMB, was shot outside his grandmother's house on Lombard Street in Wilmington.[14] Miller had been playing with his infant cousin and aunt who were just inside the screen door. As Miller's cousin and aunt began making their way toward the interior of the house, his aunt heard Miller exclaim, "Grandmom, I got shot."[15] The forensic nurse examiner who

---

[8] *Id.* at A0663.
[9] *Id.* at A0669.
[10] *Id.* at A0669-70.
[11] *Id.* at A0651.
[12] *Id.* at A0643.
[13] *Id.* at A1193-94.
[14] *Id.* at A0702-03; A0712-13; A1205.
[15] *Id.* at A0712.

4

treated Miller at the hospital testified that Miller said, "I was outside smoking at my grandmother's house. These two kids walked by the house. They didn't say anything. They walked by the house again. I heard one shot. They were close, about arm's length. I ran inside to my grandmom's house."[16] Miller told police he knew the shooter by the name "D-Nice" and identified Taylor in a photo line-up.[17]

Investigators reviewed surveillance video from the area which showed two people walking toward the 1000 block of Lombard Street where the shooting occurred and then fleeing the area immediately after.[18] One individual was wearing a black and gray hat with an emblem on the bill and a hoodie with white strings and a red stripe.[19] Harris-Dickerson testified that Smith and Taylor were the two people in the video.[20] He explained that he recognized Smith because Smith often wore a black and gray Armani Exchange hat that looked like the one the suspect was wearing in the video.[21] Police recovered a Herter's 9mm shell casing from the steps in front of the house where Miller was shot.[22]

---

[16] *Id.* at A0730.
[17] App. to Answering Br. at B6.
[18] App. to Opening Br. at A0706; A0708.
[19] *Id.* at A0706; A0711.
[20] *Id.* at A1205.
[21] *Id.* at A1204-05.
[22] *Id.* at A0987; A0723.

5

## C.

Two days later, on May 18, 2016, Temijiun Overby was shot during an attempted robbery on Thatcher Street in Wilmington. Video surveillance showed two people, later determined to be Smith and Harris-Dickerson, walking behind Overby and his friends.[23] Smith approached the group while Harris-Dickerson lingered about 20-30 feet behind.[24] Smith shot Overby because Overby refused to hand over his property.[25]

Latasha Pierce was Harris-Dickerson's girlfriend at the time.[26] She lived at 508 Shearman Street in Wilmington, and Harris-Dickerson was "there all the time."[27] Two months prior, on March 10, 2016, Harris-Dickerson accompanied Pierce to Cabela's Sporting Goods where she purchased a 9mm Canik pistol.[28] Pierce testified that on the night of the attempted robbery of Overby, Harris-Dickerson was in possession of the 9mm Canik.[29] She testified that she drove with Harris-Dickerson and Smith to Northeast Market Street on the corner of Thatcher Street and Northeast Boulevard.[30] While she was inside shopping, Harris-Dickerson

---

[23] Harris-Dickerson testified that he was able to identify Smith by the same black and gray Armani Exchange hat. *Id.* at A1204.
[24] *Id.* at A0700.
[25] *Id.* at A1201.
[26] *Id.* at A1066; A1197.
[27] *Id.* at A1056.
[28] *Id.* at A1054-57. Pierce pled guilty to Giving a Firearm to a Person Prohibited. *Id.* at 1056.
[29] *Id.* at A1058.
[30] *Id.* at A1057.

and Smith observed Overby and his friends exiting the store and decided they wanted to rob them.[31] Pierce testified that Smith asked Harris-Dickerson for the 9mm pistol before they left the car to follow Overby and his friends.[32] Harris-Dickerson testified that Smith shot Overby with a 9mm pistol.[33] Investigators recovered a Herter's 9mm shell casing from the scene of Overby's shooting.[34]

## D.

The next day, on May 19, 2016, high school freshman Brandon Wingo was shot while walking home from school with a group of classmates. Wingo and a friend were walking a few paces behind the larger group when Wingo noticed a person wearing a black jacket walk toward them on Clifford Brown Walk.[35] Wingo's classmates recalled thinking the jacket was odd because it was hot outside.[36] Wingo told his classmate, "There goes the opp."[37] After passing the larger group, the person in the black jacket reached in his pocket, yelled something, and pulled out a gun.[38] The person fired three shots.[39] Wingo's classmates spread out and ran. The friend walking with Wingo froze and screamed.[40] Wingo also

---

[31] *Id.* at A1058.
[32] *Id.*
[33] *Id.* at A1201.
[34] *Id.* at A0698; A0958.
[35] *Id.* at A0805.
[36] *Id.* at A0784; A0796; A0801; A0805.
[37] *Id.* at A0805. An "opp" is a member of an opposing gang. *Id.* at A0772.
[38] *Id.* at A0784-85.
[39] *Id.* at A0785; A0794-95.
[40] *Id.* at A0805-06.

began to run, but he was struck in the head and buttocks.[41] Wingo died from his injuries.

Treasure Evans was walking to her grandmother's house on Clifford Brown Walk when the shooting occurred. Evans testified that Taylor drove by in a light blue car minutes before the shooting.[42] She recognized Taylor, who was sitting in the front passenger seat wearing a black hoodie, because she and Taylor had attended the same middle school.[43] Evans witnessed the shooting. She testified that the shooter was wearing all black, but she could not see his face. She told police she "assumed" Taylor was the shooter because the person she recognized in the front passenger seat of the car was the same person she saw firing shots at Wingo.[44] Evans also identified Taylor in a photo line-up.[45]

Evans's mother, Nadana Sullivan, was on Clifford Brown Walk waiting for her daughter to return home from school at the time of the shooting. Sullivan saw the shooter run down the street and turn onto Shearman Street with the gun still in his hand.[46] Sullivan did not see the shooter's face, but she testified that "the

---

[41] *Id.* at A1022-23.
[42] *Id.* at A0812.
[43] *Id.*
[44] *Id.* at A0898-99 ("I said it was Diamonte . . . . Because that's who I seen in the car, and it's the same person who shot Brandon . . . . But I know what I seen. And I'm telling you what I seen. If I actually seen his face, I'm like oh, yeah, that was actually him, but I didn't see his face. And so I can't say that that was actually him, but I assumed it was him."); *id.* at A0904-05.
[45] *Id.* at A0918.
[46] *Id.* at A0821.

children" told her that the shooter's name was Diamonte.[47]  Sullivan also testified that she had seen the person she now knew to be Taylor standing with another individual "fiddling around with a gun" on the corner of Clifford Brown Walk and Shearman Street three days before Wingo's murder.[48]

Harris-Dickerson testified that he was with Taylor and Smith the day Wingo was murdered.[49]  He explained that Wingo had recently posted something disrespectful about a deceased STK member on Facebook.  Harris-Dickerson, Taylor, and Smith agreed to shoot Wingo, or any other OMB member, on the spot.[50]  They knew where Wingo went to school and the routes he walked home.[51]

Pierce testified that Harris-Dickerson often borrowed her Ford Fusion and that he and Taylor drove her to work in her car at 2:30 p.m. the day Wingo was shot.[52]  According to Harris-Dickerson, he and Taylor drove to Clifford Brown Walk after dropping Pierce off at work.[53]  They saw Wingo walking with a group of classmates.  Taylor said that he wanted to shoot Wingo from the car.[54]  Harris-Dickerson said no and stopped the car.[55]  Taylor got out of the car and took a gun and his winter coat

---

[47] *Id.* at A0825-26.
[48] *Id.* at A0826.
[49] *Id.* at A1204.
[50] *Id.*
[51] *Id.*
[52] *Id.* at A1057; A1059.
[53] *Id.* at A1203.
[54] *Id.*
[55] *Id.*

with him.[56]  Harris-Dickerson drove away.  Harris-Dickerson said he heard gunshots a few moments later and began heading back toward Shearman Street.[57]

Video surveillance from moments after the shooting showed Taylor running toward 508 Shearman Street just as Harris-Dickerson was parking the Ford Fusion.[58] Harris-Dickerson testified that he met Taylor and Smith inside the house at 508 Shearman Street.[59]  There, Taylor announced that he shot Wingo.  The three returned to the Ford Fusion and drove down Clifford Brown Walk toward where Wingo was shot.  Harris-Dickerson said that Taylor laughed as they passed Wingo's body lying between two parked cars.[60]

Harris-Dickerson, Taylor, and Smith eventually met up with Pierce, and the four traveled to North Carolina.[61]  Pierce returned to Delaware immediately, while Harris-Dickerson, Taylor, and Smith stayed in North Carolina for a few days before returning to Wilmington.[62]  Harris-Dickerson testified that Taylor and Smith "shared" possession of the 9mm Canik during that time.[63]

---

[56] *Id.*
[57] *Id.*
[58] *Id.* at A1206.
[59] *Id.* at A1203.
[60] *Id.* at A1206.
[61] *Id.*
[62] *Id.* at A1060; A1206.
[63] *Id.* at A1206.

Investigators collected Herter's brand 9mm shell casings from the scene of Wingo's murder.[64] Ballistics analysis revealed that the same gun was used to shoot Miller, Overby, and Wingo.[65]

E.

On May 30, 2016, Shawn Garrett and his friend Tiheed Roane were walking across the 11th Street Bridge in Wilmington. Garrett, who is Brandon Wingo's first cousin, noticed that a car had passed them more than once.[66] Garrett told Roane to run.[67] As they were running, Roane looked back and saw two people getting out of the car.[68] During a police interview the next day, Roane said he saw Grimey pointing a gun in their direction and D-Nice sitting in the passenger seat making a shooting gesture with his hands.[69]

Also on May 30, 2016, police responded to a 9-1-1 call reporting a person with a gun near 27th and North Tatnall Streets in Wilmington. The suspect was a "black male wearing a gray baseball cap, black T-shirt, and blue jeans."[70] The first officer to arrive observed someone matching that description walking on West 27th Street.[71] When the responding officer made eye contact with the individual, the

---

[64] *Id.* at A0779-80.
[65] *Id.* at A0999.
[66] *Id.* at A0965.
[67] *Id.*
[68] *Id.* at A0965; A0974.
[69] *Id.* at A0948; A0974.
[70] *Id.* at A0948.
[71] *Id.*

individual grabbed his waistband and started walking quickly down West Street.[72] The officer testified that she knew from her training and experience that clenching a waistband is a characteristic of someone who is armed.[73] The officer ordered the suspect to stop and put his hands in the air.[74] As the suspect raised his arms, the officer noticed a firearm slip from the suspect's waistband down his pantleg. The suspect was arrested, and officers seized the gun. The suspect was later identified as Smith.[75]

## II.

On June 1, 2016, United States Marshals arrested Taylor while a passenger in a car driven by Latasha Pierce's sister, Corliss Pierce.[76] In a search incident to the arrest, the Marshals found two smartphones in Taylor's pants pockets—a white Samsung and a white Motorola.[77] Wilmington Police obtained a search warrant for the car and recovered two more smartphones—a black ZTE and a second white Samsung with a pink cover.[78] Latasha Pierce told investigators that the smartphone with the pink cover was her smartphone.[79] Wilmington Police executed a search

---

[72] *Id.*
[73] *Id.* at A0948-49.
[74] *Id.* at A0949.
[75] *Id.* at A0955.
[76] *Id.*
[77] *Id.* at A1043.
[78] *Id.* at A0258.
[79] *Id.*

warrant for 508 Shearman Street and found two black coats, a black Canik 9mm gun case, and a box of Herter's 9mm ammunition.[80]

Wilmington Police Detective MacKenzie Kirlin applied for a warrant to search Taylor's smartphones. In her supporting affidavit, the Detective recounted the gang-related shooting incidents, the gang and personal connections among those involved, the smartphones found in Taylor's pockets, and the smartphones in Corliss Pierce's car. According to the Detective, her training, knowledge, and experience led her to believe that people involved in criminal acts like those described in her affidavit use smartphones to communicate about their illegal acts.[81] On June 16, 2016, the Justice of the Peace Court approved a warrant to search for:

> any/all data stored by whatever means, or through normal course of business of wireless services, and/or through the forensic examination of said cellular telephone, to include but not limited to registry entries, pictures, photographs, images, audio/visual recordings, multi-media messages, web browsing activities, electronic documents, location information, text messaging, writings, user names, subscriber identifiers, buddy names, screen names, calendar information, call logs, electronic mail, telephone numbers, any similar information/data indicia of communication, and any other information/data pertinent to this investigation within said scope.[82]

---

[80] *Id*. at A1025-28.
[81] *Id*. at A0256-60.
[82] *Id.* at A0254-55.

Using Cellebrite[83] software, police extracted 4,645 pages from the white Motorola smartphone—data from January 2005 to June 2016.[84] This appears to be the entire digital universe of the smartphone.[85] The search yielded data from 23 areas of the phone, including 31 autofill fields, 12 user accounts, 5 passwords, 2,215 contacts, 514 call logs, 4,737 SMS messages, 63 MMS messages, 146 Facebook and Google+ chats, 611 locations, and 26,792 web browsing entries.[86] The search also produced 17,672 individual audio, video, image, text, configuration, database and application data files.[87] Of the 17,672 data files retrieved, 17,395—or 98 percent—were included in the final extraction report.[88]

A New Castle County grand jury indicted Taylor and Smith for Robbery First Degree, Possession of a Firearm During the Commission of a Felony ("PFDCF"), Aggravated Menacing, and Conspiracy Second Degree.[89] A series of superseding indictments modified the charges against Taylor and Smith and added Harris-Dickerson and Pierce as co-defendants. Eventually, the State charged Taylor with one count of Gang Participation supported by fifteen underlying offenses, one count

---

[83] *Id.* at A1045-46; *About*, CELLEBRITE, https://www.cellebrite.com/en/about/.
[84] App. to Opening Br. at A0295-96. The search of Taylor's white Samsung (the other phone mentioned in the warrant) yielded 388 pages of data. *Id.* at 0236. The extraction report from the white Samsung was not admitted at trial.
[85] *Id.* at A1094.
[86] *Id.*
[87] *Id.*
[88] *Id.*
[89] *Id.* at A0023-30.

of Robbery First Degree, one count of Attempted Robbery First Degree, four counts of PFDCF, one count of Assault First Degree, two counts of Reckless Endangering First Degree, two counts of Aggravated Menacing, one count of Conspiracy Second Degree, one count of Possession of a Firearm by a Person Prohibited ("PFBPP"), one count of Conspiracy First Degree, and one count of Murder First Degree.[90]

Taylor filed a motion to suppress all evidence obtained from a search of his smartphones.[91] He argued that the search warrant was not supported by probable cause and was an unconstitutional general warrant because it lacked particularity by failing to specify the places on the smartphone to be searched and a time frame for the search.[92] The Superior Court denied Taylor's motion. In a transcript ruling, the court found there was sufficient information for the Magistrate to find probable cause because Harris-Dickerson communicated with Taylor about gang activity using smartphones. This fact, according to the court, established a logical nexus between the alleged criminal activity and the contents of Taylor's smartphones. The court further found that the warrant was not a general warrant. As the court explained, the warrant "specifically limited the officer's search to the cellphones and to certain types of data, media and was pertinent to this investigation . . . ."[93] Finally,

---

[90] *Id.* at A0124-42.
[91] Taylor also moved to suppress his June 1, 2016 custodial statement to police. *Id.* at A0109-23. The Superior Court granted the motion as unopposed after the State agreed not to admit the statement during its case-in-chief. *Id.* at A0013-14; A0276.
[92] *Id.* at A0230-65.
[93] *Id.* at A0302-03.

15

the court found that references in the Detective's affidavit to the May 16, 2016 shooting, the May 19, 2016 murder, and Taylor's arrest on June 1, 2016, demonstrated that the warrant "limit[ed] the search to a narrow time frame."[94] The court reasoned that "whatever incriminating text messages and photos were found were within the narrow scope of the digital search that was requested in the affidavit."[95]

Before trial, Harris-Dickerson pled guilty and agreed to testify at trial against the other defendants.[96] The Superior Court granted Taylor's motion to sever his case from the other defendants. At trial, the State offered into evidence 95 pages from the 4,645-page extraction report of Taylor's white Motorola smartphone.[97] The 95-page excerpt included: 31 autofill fields, 12 user accounts, 82 contacts, 184 call log entries, 32 thumbnail images, 16 MMS messages and accompanying thumbnail images, over 200 SMS messages, over 100 Facebook Messenger chats and attachments, and hundreds of web browsing entries.[98] Full-size versions of 15 thumbnail images from various areas of the phone were introduced as separate exhibits.[99] The information introduced included photos of Taylor with the gun

---

[94] *Id.* at A0303.
[95] *Id.* at A0302.
[96] *Id.* at A0448.
[97] *Id.* at A1092-1187.
[98] *Id.* at A1095-1187; A1227-37.
[99] *Id.* at A1104; A1113; A1128; A1130; A1133-34; A1137; A1143; A1167-68; A1170; A1172-73; A1175-76.

linked to the murder, text messages, connections to social media posts, and statements by Taylor in which he implied he had killed Wingo.

After a ten-day trial, a jury convicted Taylor of Murder First Degree, Gang Participation, two counts of Reckless Endangerment, two counts of PFDCF, two counts of Aggravated Menacing, and Assault First Degree. Taylor was found not guilty of Robbery First Degree, Attempted Robbery First Degree, and the associated counts of PFDCF. The Conspiracy First Degree, Conspiracy Second Degree, and the severed PFBPP charges were dismissed.[100] The Superior Court denied Taylor's motion for a new trial. On January 31, 2020, the Superior Court sentenced Taylor to a mandatory life sentence for Murder First Degree. The court also sentenced Taylor to an additional eleven years at Level V incarceration for the remaining charges.

## III.

Although Taylor raises several arguments on appeal, we focus on one argument that is dispositive—whether the warrant to search his smartphones was a general warrant, prohibited by the Fourth Amendment of the United States Constitution, Article I, Section 6 of the Delaware Constitution, and statutory law. Taylor argues that the warrant was a general warrant, as it authorized a search for "any/all data" stored on his two smartphones and was not limited to specific files or

---

[100] App. to Opening Br. at A0017.

file types.[101] The warrant also placed no time limit on the data searched and collected.[102] Given the importance of the smartphone data to the prosecution's trial strategy, Taylor claims that the Superior Court's error was not harmless.[103] He points to the prosecutor's closing argument, which contained many references to evidence taken from one of the smartphones, including photographs, text messages, and other admissions of criminal activity.[104]

The State responds that the warrant was not a general warrant because the search warrant application contained the dates of events relevant to the investigation which could be used as time limitations.[105] Although the State concedes the warrant was "not as specific as it could have been," it also claims that this shortcoming was "remedied by limiting the State's evidence to the timeframe for which the warrant provided probable cause."[106] Finally, the State claims that any error in admitting the evidence seized from Taylor's smartphones was harmless because the other admissible evidence of his guilt was "overwhelming," citing Facebook posts, witnesses, and ballistics reports, among other evidence.[107]

---

[101] Opening Br. at 35-36; App. to Opening Br. at A0254.
[102] Opening Br. at 38-39.
[103] Reply Br. at 14-19.
[104] *Id.*
[105] Answering Br. at 34.
[106] Oral Argument at 23:57 (June 16, 2021), https://livestream.com/delawaresupremecourt/events/9697320/videos/222453600; Answering Br. at 36-37.
[107] *Id.* at 42-43; Oral Argument at 31:55 (June 16, 2021), https://livestream.com/delaware

This Court reviews alleged constitutional violations *de novo*.[108]  We also apply a *de novo* standard of review to the Superior Court's legal conclusions regarding the denial of a motion to suppress.[109]  "We review the trial judge's factual findings [on a motion to suppress] to determine whether there was sufficient evidence to support the findings and whether those findings were clearly erroneous."[110]

## A.

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Article I, Section 6 of the Delaware Constitution also protects individuals from unreasonable searches and seizures:

> The people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures; and no warrant to search any place, or to seize any person or thing, shall issue without describing them as particularly as may be; nor then, unless there be probable cause supported by oath or affirmation.

---

supremecourt/events/9697320/videos/222453600 ("There was video, there was [*sic*] 911 calls, there was [*sic*] guns, there were ballistics, palm prints, there were witnesses that placed Taylor at various crime scenes.").

[108] *Bradley v. State*, 51 A.3d 421, 433 (Del. 2012).

[109] *Id.* (citing *Lopez-Vazquez v. State*, 956 A.2d 1280, 1284-85 (Del. 2008)).

[110] *West v. State*, 143 A.3d 712, 715 (Del. 2016) (citing *Lopez-Vazquez*, 956 A.2d at 1285).

Under Delaware statutory law, which sets forth the specific requirements for warrant applications,[111] the search warrant must state with particularity the person or place to be searched and the items sought in as much detail as possible:

> If the judge, justice of the peace or other magistrate finds that the facts recited in the complaint constitute probable cause for the search, that person may direct a warrant to any proper officer or to any other person by name for service. The warrant shall designate the house, place, conveyance or person to be searched, and shall describe the things or persons sought as particularly as possible.[112]

As is apparent from the foregoing constitutional and statutory requirements, a search warrant must be supported by probable cause, and be as particular as possible. In our recent decision in *Buckham v. State*,[113] we summarized the constitutional and statutory standards governing search warrants:

> For a search warrant to issue, there must be more than just probable cause that a crime has been committed; there must also be, "within the four corners of the affidavit, . . . facts adequate for a judicial officer to form a reasonable belief that . . . the property to be seized will be found in a particular place." The constitutional requirement that there be a nexus between the crime and the place to be searched is also enshrined in Delaware law, which requires the warrant application to not only "describe the things . . . sought as particularly as may be," but also to "state that . . . such things are concealed in the house, place, conveyance or person designated and . . . recite the facts upon which such suspicion is founded."[114]

---

[111] 11 *Del. C.* § 2306.
[112] *Id.* at § 2307(a).
[113] 185 A.3d 1 (Del. 2018).
[114] *Id.* at 16 (internal citations omitted) (first quoting *Sisson v. State*, 903 A.2d 288, 296 (Del. 2006), then quoting 11 *Del. C.* § 2306).

Like the appeal in *Buckham*, we are again confronted with a warrant to search a smartphone. We use the word smartphone, as the term "cell phone" does not describe adequately the scope and intimacy of the information contained in these devices. As the United States Supreme Court observed in *Riley v. California*,[115] a smartphone search "typically expose[s] to the government far *more* than the most exhaustive search of a house,"[116] including "a broad array of private information never found in a home in any form."[117] People now "keep on their person a digital record of nearly every aspect of their lives—from the mundane to the intimate."[118] Smartphones "have become [a] pervasive and insistent . . . part of daily life" and "an important feature of human anatomy."[119] They "collect[] in one place many distinct types of information—an address, a note, a prescription, a bank statement, a video— that reveal much more in combination than any isolated record."[120] Smartphone searches "implicate privacy concerns far beyond those implicated" by other searches and, accordingly, receive heightened constitutional scrutiny.[121] Given the "substantial" risk that "warrants for digital and electronic devices [may] take on the character of 'general warrants,'" "[t]his reality necessitates heightened vigilance, at

---

[115] 573 U.S. 373 (2014).
[116] *Id.* at 396-397 (emphasis in original).
[117] *Id.* at 397.
[118] *Id.* at 386, 395 (citing *Ontario v. Quon*, 560 U.S. 746, 760 (2010)).
[119] *Id.* at 385.
[120] *Id.* at 394.
[121] *Id*. at 393.

21

the outset, on the part of judicial officers to guard against unjustified invasions of privacy."[122]

In *Buckham*, the police obtained a search warrant for smartphone data to track the defendant's whereabouts in the six weeks prior to his arrest.[123] The *Buckham* search warrant, however, went beyond that specific need, and authorized the police to search the smartphone for not just GPS data, but "[a]ny and all store[d] data contained within the internal memory of the cellular phones [*sic*], including but not limited to, incoming/outgoing calls, missed calls, contact history, images, photographs and SMS (text) messages" for evidence of "Attempted Murder 1st Degree."[124] At trial, prosecutors introduced incriminating Facebook exchanges recovered from the search. We held, as a matter of plain error, that the warrant application allegations were "too vague and too general to connect [Buckham's] cell phone to the shooting," undermining the finding of probable cause by the trial court.[125]

We also held that a warrant must "describe the items to be searched for and seized with as much particularity as the circumstances reasonably allow" and be "no

---

[122] *Wheeler*, 135 A.3d at 307.
[123] 185 A.3d at 6.
[124] *Id.* at 15 (alterations in original).
[125] *Id.* at 17.

broader than the probable cause on which it is based."[126]  The search warrant in

*Buckham* failed both requirements because:

> the warrant did not limit the search of Buckham's cell phone to any relevant time frame and authorized the search of any data on the phone. Worse still, it authorized law enforcement to search categories of data that had nothing to do with GPS location information, like "incoming/outgoing calls, missed calls, contact history, images, photographs and SMS (text) messages."  So this warrant was both vague about the information sought—despite the fact that a far more particularized description could have been provided—and expressly authorized the search of materials there was no probable cause to search, like the contents of all of the Facebook messages Buckham sent.[127]

Our ruling in *Buckham* relied on another of our recent search warrant decisions, *Wheeler v. State*.[128]  In *Wheeler* we recognized that, after *Riley v. California*, electronic devices require greater protections than other forms of property, given the "enormous potential for privacy violations" that "unconstrained searches" of these devices pose.[129]  We again held that a warrant has to "describe the things to be searched with sufficient particularity and be no broader than the probable cause on which it is based."[130]  Those requirements serve the Fourth Amendment's particularity and narrowness objectives—ensuring that "those searches deemed

---

[126] *Id.* at 18 (quoting *Wheeler*, 135 A.3d at 299).
[127] *Id*. at 19.
[128] 135 A.3d 282.
[129] *Id.* at 299.
[130] *Id*.

necessary [are] as limited as possible" and eliminating "exploratory rummaging in a person's belongings."[131]

The warrants in *Wheeler* failed to limit the search to any time frame, when the relevant dates were available to police. And the police had a more precise description of where evidence of criminal activity might be found that could have been included in the warrants. We determined the *Wheeler* search warrants were general warrants and violated the particularity requirement of constitutional and state law. It was also apparent from the language cut and pasted from a child pornography warrant into the *Wheeler* warrant that the State was interested in finding evidence of child pornography and not evidence of witness tampering. Although the State claimed it was searching for "evidence of written communications" related to witness tampering, the places it searched—DVDs and optical cameras—were unlikely to contain those types of communications.[132] In the end, the *Wheeler* warrants' lack of particularity "permitted the species of wide-ranging, exploratory searches the Framers intended to prohibit."[133]

## B.

We pass over the probable cause requirement and go straight to whether the Taylor search warrant satisfies the constitutional and statutory requirements that it

---

[131] *Id.* (alteration in original) (citations omitted) (quoting *Coolidge*, 403 U.S. at 467); *id.* at 296.
[132] *Wheeler*, 135 A.3d at 306.
[133] *Id.* at 307.

24

describe the items to be searched for and seized with as much particularity as the circumstances reasonably allow and is no broader than the probable cause on which it is based.[134] It does not. Like the warrant struck down in *Buckham*, the Taylor warrant authorized "a top-to-bottom search" of "[a]ny and all store[d] data" of the digital contents of the devices.[135] The Taylor warrant also "did not limit the search of [the] cell phone to any relevant time frame . . . ."[136] And like the warrants in *Buckham* and *Wheeler*, the Taylor warrant used the open-ended language "including but not limited to" to describe the places to be searched.[137] The Taylor search warrant allowed investigators to conduct an unconstitutional rummaging through all of the contents of Taylor's smartphones to find whatever they decided might be of interest to their investigation.

---

[134] The Superior Court found that there was a logical nexus between the items sought and the place to be searched based on the two incidents identified in the Kirlin affidavit, a gang rivalry motive, the smartphones found in Taylor's pockets, and Taylor and Harris-Dickerson's likely communication by smartphone. App. to Opening Br. at A0302. Given our conclusion that the warrant fails the particularity requirement, we need not address whether the search warrant satisfied the probable cause requirement.

[135] *Buckham*, 185 A.3d at 18; *see also Wheeler*, 135 A.3d at 289 (authorizing a search of "[a]ny and all data, and the forensic examination thereof, stored by whatever means on any [electronic device] seized . . . ." (emphasis omitted)).

[136] *Buckham*, 185 A.3d at 19; *see also Wheeler*, 135 A.3d at 304 (describing the warrant's shortcomings under the particularity requirement and noting "the failure to limit the search to the relevant time frame.").

[137] *Buckham*, 185 A.3d at 15; *see also Wheeler*, 135 A.3d at 289 (listing the areas of the phone to be searched "to include but not limited to: registry entries, pictures, images, temporary internet files, internet history files, chat logs, writings, passwords, user names, buddy names, screen names, email, connection logs, or other evidence.").

The Superior Court found that the Taylor warrant was not a general warrant for several reasons:

--the warrant "specifically limited the officer's search to the cellphones and to certain types of data, media and was pertinent to this investigation;"

--"the State's response was that the -- whatever incriminating text messages and photos were found were within the narrow scope of the digital search that was requested in the affidavit;" and

--"the warrant here does limit the search to a relevant time frame," "a narrow time frame," and it was limited to "the evidence that will be requested to be presented in this case."[138]

None of these reasons withstand scrutiny.[139] First, the fact that the investigator identified the smartphones as the object of the search and the data on the smartphones as the things to be searched does not satisfy the particularity requirement. The warrant was not limited. It authorized a search of "any and all data" on the smartphones. The search could have been limited to smartphone data tied specifically to the probable cause supporting the warrant. We held in *Buckham* that the warrant failed constitutional review because it "did not limit the search of Buckham's cell phone to any relevant time frame and authorized the search of any

---

[138] App. to Opening Br. at A302-03.
[139] We appreciate that the Superior Court did not have the benefit of our *Buckham* decision at the time it decided the motion to suppress. *Wheeler* and *Buckham* were our Court's first opportunity to consider the United States Supreme Court's *Riley* decision and the evolving jurisprudence for search warrants and electronic information. *See State v. Reese*, 2019 WL 1277390 at *5-7 (Del. Super. Ct. Mar. 18, 2019) (recognizing that search warrants for electronic devices are held to a higher standard after *Wheeler* and *Buckham*).

26

data on the phone."[140] The same is true here. While we are reluctant to make specific pronouncements about what is required in a search warrant for electronic devices for fear that we might tie the hands of investigators, we can say for certain that more specificity was possible and required than simply identifying the smartphones to be searched and all of their data.[141]

Second, a warrant that allows investigators to search for "any and all data" "pertinent to the criminal investigation" is unlimited in scope. To find information pertinent to the investigation, investigators were authorized, in general warrant fashion, to rummage through all of the smartphones' contents. The free-ranging search for anything "pertinent to the investigation" undermines the essential protections of the Fourth Amendment—that a neutral magistrate approve in advance, based on probable cause, the places to be searched and the parameters of the search. Although the record is not entirely clear, investigators apparently extracted almost all data from Taylor's smartphones from an eleven-year time span, and then searched without restriction for evidence of criminal conduct.

Third, the Superior Court erred when it found that investigators searched for and found evidence "within the narrow scope of the search requested in the

---

[140] 185 A.3d at 19.
[141] *See Wheeler*, 135 A.3d at 306-07 (pointing out the warrants did not restrict the search to places likely to contain evidence of written witness tampering); *Buckham,* 185 A.3d at 19 (holding a warrant was not particular in part because it "authorized law enforcement to search categories of data that had nothing to do with GPS location information.").

affidavit." This finding is circular. The affidavit contains essentially the same all-encompassing language of the search warrant, with the "any and all data" and "including but not limited to" language.[142]

The Superior Court relied on our decision in *Starkey v. State*.[143] In *Starkey*, we upheld two cellphone warrants that used language similar to the warrant at issue here.[144] We found that the *Starkey* warrants "limit[ed] the officer's search of the cell phones to certain types of data, media, and files that were 'pertinent to th[e] investigation.'"[145] That language, we reasoned, "effectively limited the scope of the warrants, and prevented a boundless search of the cell phones."[146]

Our *Starkey* decision predates *Riley*, *Wheeler*, and *Buckham*. The constitutional landscape—as well as the technological one—has changed. *Starkey* does not reflect the United States Supreme Court's or this Court's current view on

---

[142] App. to Opening Br. at A0259, ¶ 25.
[143] 2013 WL 4858988 (Del. Sept. 10, 2013).
[144] *Id.* at *4. In *Starkey*, the warrant for the defendant's LG cell phone read as follows:

> [A]ny and all data stored by whatever means, or through normal course of business of Verizon Wireless services, and/or through the forensic examination of said telephone, to include but not limited to registry entries, pictures, photographs, images, audio/visual recordings, multi-media messages, web user names, subscriber identifiers, buddy names, screen names, calendar information, call logs, electronic mail, telephone numbers, any similar information/data indicia of communication, any other information/data [sic] pertinent to this investigation within said scope.

*Id.* The warrant for the second cell phone was almost identical, but it reflected a different cell phone carrier and listed two additional categories of data. *Id.*
[145] *Id.*
[146] *Id.*

warrants seeking evidence from electronic devices. After our recent decisions, a search warrant for electronic devices must contain more than a general authorization to search all the contents of electronic devices for evidence of criminal conduct.

Finally, even though the search warrant was, in the State's words, "not as specific as it could have been," the State claims that the Superior Court held correctly that defects in the warrant "could be remedied by limiting the State's evidence to the timeframe for which the warrant provided probable cause."[147]

There is no room, however, for limited suppression of evidence seized under a general warrant. As the Third Circuit has explained:

> There is a legal distinction between a general warrant, which is invalid because it vests the executing officers with unbridled discretion to conduct an exploratory rummaging through [the defendant's] papers in search of criminal evidence, and an overly broad warrant, which "'describe[s] in both specific and inclusive general terms what is to be seized,' but 'authorizes the seizure of items as to which there is no probable cause . . . .'" [A]n overly broad warrant can be redacted to strike out those portions of the warrant that are invalid for lack of probable cause, maintaining the remainder of the warrant that satisfies the Fourth Amendment. In contrast, the only remedy for a general warrant is to suppress all evidence obtained thereby.[148]

The Taylor warrant and its supporting affidavit did not describe "in both specific and inclusive general terms what is to be seized." Instead, it "vest[ed] the

[147] Oral Argument at 23:57 (June 16, 2021), https://livestream.com/delawaresupremecourt/events/9697320/videos/222453600; Answering Br. at 36-37.

[148] *United States v. Yusuf*, 461 F.3d 374, 393 n.19 (3rd Cir. 2006) (internal citations omitted). *See also Coolidge v. New Hampshire*, 403 U.S. 443 (1971) (a general warrant permits "a general exploratory rummaging in a person's belongings.").

executing officers with unbridled discretion to conduct an exploratory rummaging through [the defendant's] papers in search of criminal evidence." Thus, the constitutional violation cannot be cured by limited suppression.[149]

## C.

As a final matter, we turn to whether the admission of the illegally obtained evidence was harmless error. When evidence has been admitted erroneously, we first distinguish between ordinary evidentiary missteps and errors of constitutional magnitude. When the error does not implicate constitutional rights, "[t]he well-established rule is that where the evidence exclusive of the improperly admitted evidence is sufficient to sustain a conviction, error in admitting the evidence is harmless."[150] But when, as here, the error violated the defendant's constitutional rights, an error is harmless only if the State proves "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained."[151]

---

[149] Because the Taylor warrant is a general warrant not subject to limited suppression, the State's reliance on *State v. Rizzo*, 2018 WL 566794 (Del. Super. Ct. Jan. 26, 2018) and *State v. Anderson*, 2018 WL 6177176 (Del. Super. Ct. Nov. 5, 2018) is misplaced. In *Rizzo*, the court relied on our decision in *Starkey*, which after *Buckham* and *Wheeler* no longer reflects our Court's stance on search warrants for electronic devices. In *Anderson*, the court relied upon the Superior Court's decision in this case, which we reverse. We note that, in *State v. Waters*, 2020 WL 507703 (Del. Super. Ct. Jan. 30, 2020), another case cited by the State, the Superior Court distinguished between an overbroad warrant (where limited suppression can be used) and a general one (which is facially invalid).
[150] *Johnson v. State*, 587 A.2d 444, 451 (Del. 1991).
[151] *Dawson v. State*, 608 A.2d 1201, 1204 (Del. 1992); *Johnson*, 587 A.2d at 451; *Delaware v. Van Arsdall*, 475 U.S. 673 (1986).

We cannot conclude beyond a reasonable doubt that the jury's verdict would have been the same without illegally seized smartphone evidence. The State charged Taylor with crimes related to four separate incidents: the armed robbery of Rivera and McDonald, Miller's shooting, Wingo's murder, and the aggravated menacing of Garrett and Roane. The evidence introduced from the cell phone extraction report implicated Taylor in the shooting, murder, and aggravated menacing, but not the armed robbery. Specifically, the State offered several text messages where Taylor insinuated that he shot Miller and Wingo.[152] The State also introduced text messages where Taylor wrote that he and Smith were tailing Garrett and Roane the night that the aggravated menacing occurred.[153] Finally, the State admitted photos of Taylor with a gun and photos showing Taylor wearing a hat matching one visible in the security camera footage of some of the incidents.[154] The jury convicted Taylor on all charges related to the crimes where the State presented evidence from the extraction report. Taylor was acquitted on all charges stemming from the incidents absent from the extraction report, namely the armed robbery of Rivera and McDonald.[155] The smartphone evidence was critical to the State's case and Taylor's convictions, and its admission was not harmless error beyond a reasonable doubt.

---

[152] App. to Opening Br. at A1236.
[153] *Id.*
[154] *Id.* at A1278.
[155] Opening Br. at 5-6; Reply Br. at 14-19.

IV.

"[T]he warrant requirement is 'an important working part of our machinery of government,' not merely 'an inconvenience to be somehow "weighed" against the claims of police efficiency.'"[156]  Indeed, "[t]he occasional suppression of illegally obtained yet probative evidence has long been considered a necessary cost of preserving overriding constitutional values."[157]  The Superior Court should have granted Taylor's motion to suppress all evidence from the search of his smartphones. We reverse the Superior Court's judgment, vacate Taylor's convictions, and remand for a new trial consistent with this opinion.

---

[156] *Riley*, 573 U.S. at 401 (quoting *Coolidge*, 403 U.S. at 481).
[157] *James v. Illinois*, 493 U.S. 307, 311 (1990) (citing *Arizona v. Hicks*, 480 U.S. 321, 329 (1987)).

**VAUGHN**, Justice, concurring:

I agree that the warrant here, which authorizes a seizure of "any/all . . . information pertinent to the investigation within said scope," does not limit itself to the seizure of things which have been described with particularity. I concur in the judgment of the Court.